| | |
|---|---|
| 1 | Michael C. Fallon, SBN 088313 |
| | Michael C. Fallon, Jr., SBN 303082 |
| 2 | 100 E Street, Suite 219 |
| | Santa Rosa, California 95404 |
| 3 | Telephone: (707) 546-6770 |
| | Facsimile: (707) 546-5775 |
| 4 | mcfallon@fallonlaw.net |
| 5 | fallonmc@fallonlaw.net |
| 6 | Philip J. Terry (SBN 148144) |
| | Kimberly Corcoran (SBN 148229) |
| 7 | CARLE, MACKIE, POWER & ROSS LLP |
| | 100 B Street, Suite 400 |
| 8 | Santa Rosa, California 95401 |
| | Telephone: (707) 526-4200 |
| 9 | Facsimile: (707) 526-4707 |
| | pjterry@cmprlaw.com |
| 10 | kcorcoran@cmprlaw.com |
| 11 | Attorneys for Debtor/Plaintiff |
| | KINGSBOROUGH ATLAS TREE SURGERY, INC. |
| 12 | |

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| 15 | IN RE: | Case No. 25-10088 WJL |
| 16 | KINGSBOROUGH ATLAS TREE SURGERY, INC. | Chapter 11 |
| 17 | | |
| 18 | Debtor. | |
| 19 | KINGSBOROUGH ATLAS TREE SURGERY, INC. | AP No. 25-01005 |
| 20 | Plaintiff, | **NOTICE OF REMOVAL OF LAWSUIT PENDING IN STATE COURT TO BANKRUPTCY COURT [28 USC § 1452]** |
| 21 | | |
| 22 | vs. | |
| 23 | ANVIL POWER, INC., a California corporation; ANVIL EQUIPMENT COMPANY LP, a California limited partnership; ANVIL BUILDERS, a California Corporation; ANVIL HOLDINGS, INC., a California corporation; ANVIL GROUP, LLC, a California limited liability company; ALAN GUY, an individual; RICHARD J. LEIDER, an individual, and DOES 1-100. | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | Defendants. | |

CARLE, MACKIE,
POWER & ROSS LLP

1

TO ANVIL POWER, INC., a California corporation, ANVIL EQUIPMENT COMPANY LP, California limited partnership; ANVIL BUILDERS, a California corporation; ANVIL HOLDINGS, INC., a California corporation; ANVIL GROUP, LLC, a California limited liability company; ALAN GUY, an individual; RICHARD LEIDER, an individual, and their attorneys of record, and the SONOMA COUNTY SUPERIOR COURT:

Plaintiff/Debtor KINGSBOROUGH ATLAS TREE SURGERY, INC., hereby removes the lawsuit entitled KINGSBOROUGH ATLAS TREE SURGERY, INC. , et al., vs. ANVIL POWER, INC., a California corporation, ANVIL EQUIPMENT COMPANY LP, California limited partnership, ANVIL BUILDERS, a California corporation, ANVIL HOLDINGS, INC., a California corporation, ANVIL GROUP, LLC, a California limited liability company, and ALAN GUY, an individual, and Does 1 – 100, Sonoma County Superior Court in and for the State of California. Case No. 25CV00751, to the United States Bankruptcy Court for the Northern District of California, Oakland Division, 1300 Clay Street, Oakland, California, and hereby gives notice of such removal to each of the following:

1. Sonoma County Superior Court, 3055 Cleveland Avenue, Santa Rosa, CA, 95403;

2. Sean J. Filippini DOWNEY BRAND LLP, 621 Capitol Mall, 18th Floor, Sacramento, CA 95814, Telephone: (916) 444.1000, Facsimile: (916) 444.2100, Email: sfilippini@downeybrand.com. Counsel for ANVIL POWER, INC., a California corporation; ANVIL EQUIPMENT COMPANY LP, a California limited partnership; ANVIL BUILDERS, a California corporation; ANVIL HOLDINGS, INC., a California corporation; ANVIL GROUP, LLC, a California limited liability company; and ALAN GUY, an individual

Removal of the Action is based upon the following facts:

1. On January 29, 2025, Plaintiff / Debtor KINGSBOROUGH ATLAS TREE SURGERY, INC. ("Plaintiff"), filed a civil action against defendants ANVIL POWER, INC., a California corporation; ANVIL EQUIPMENT COMPANY LP, California limited partnership; ANVIL BUILDERS, a California corporation; ANVIL HOLDINGS, INC., a California corporation; ANVIL GROUP, LLC, a California limited liability company; and ALAN GUY, an individual, in the Sonoma County Superior Court, in and for the State of California, Case No. 25CV00751. The Complaint is attached hereto as **Exhibit 2**.

2. On May 13, 2025, Plaintiff filed a First Amended Complaint in the civil action above against defendants ANVIL POWER, INC., a California corporation; ANVIL EQUIPMENT COMPANY LP, California limited partnership; ANVIL BUILDERS, a California corporation; ANVIL HOLDINGS, INC., a California corporation; ANVIL GROUP, LLC, a California limited liability company; ALAN GUY, an individual; Richard Leider, an individual (hereinafter, collectively referred to as "Defendants"). This matter, including the Complaint and First Amended Complaint, are hereinafter referred to as the "Action."

3. In the First Amended Complaint, Plaintiff sues for (1) Breach of Contract; (2) Breach of the Implied Covenant of Good Faith and Fair Dealing; (3) Unfair Competition (Bus. & Professions Code section 17200; (4) Conversion; (5) Fraud (Intentional Misrepresentation); (6) Negligent Misrepresentation; (7) Conspiracy to Defraud; (8) Accounting; (9) Declaratory Relief; and (10) Injunctive Relief, as more fully set forth in the copy of the First Amended Complaint attached hereto as **Exhibit 2**.

4. The Action arises from Defendants' breaches of an Asset Purchase Agreement entered into by and between Plaintiff and Defendants on June 5, 2023. Defendants' breaches and failure to perform under the Asset Purchase Agreement directly relate to Plaintiff/Debtor KINGSBOROUGH ATLAS TREE SURGERY filing for Chapter 11 Bankruptcy.

5. The Action is not a proceeding before the United States Tax Court.

6. The Action is not a civil action by a governmental unit to enforce its police or regulatory power.

7. The Action was formerly pending in the Sonoma County Superior Court in and for the State of California.

8. On February 20, 2025, Kingsborough Atlas Tree Surgery, Inc. filed a petition for relief in the United States Bankruptcy Court, Northern District of California under Chapter 11 of the United States Bankruptcy Code, which is currently pending.

CARLE, MACKIE, POWER & ROSS LLP

9.     By the Action, Debtor sues Defendants to recover money damages for the estate caused by breach of contract and fraud perpetrated on Plaintiff/Debtor by Defendants. The Action is therefore a non-core proceeding within the meaning of 28 USC §§ 157 and 1334.

10.    Kingsborough Atlas Tree Surgery, Inc. does consent to entry of a final order in the Action by the bankruptcy court.

11.    This Court has jurisdiction over the Action pursuant to 28 USC § 1334(b).

12.    Removal of the Action to this Court is proper pursuant to 28 USC § 1452(a) and FRBP 9027.

13.    Venue for the Action is proper in this Court under 28 USC § 1452(a), because this Court is the Bankruptcy Court located in the District where the non-bankruptcy court where the Action was formerly pending was located.

14.    Attached hereto as **Exhibits 1** and **2** are true and correct copies of all pleadings filed in the Action prior to removal, as follows:

Exhibit 1:  Complaint
Exhibit 2:  First Amended Complaint

15.    The undersigned certifies that the information herein is accurate to the best of knowledge, information, and belief, formed after an inquiry reasonable under the circumstances.

Dated:  May 21, 2025                    CARLE, MACKIE, POWER & ROSS LLP


                                       By:    /s/ Philip J. Terry
                                              Philip J. Terry
                                              Kimberly Corcoran
                                              Attorneys for Plaintiffs
                                              KINGSBOROUGH ATLAS TREE
                                              SURGERY, INC., RICHARD
                                              KINGSBOROUGH, and
                                              CINDY KINGSBOROUGH

# EXHIBIT 1

Philip J. Terry (SBN 148144)
Kimberly Corcoran (SBN 148229)
CARLE, MACKIE, POWER & ROSS LLP
100 B Street, Suite 400
Santa Rosa, California 95401
Telephone: (707) 526-4200
Facsimile: (707) 526-4707
pjterry@cmprlaw.com
kcorcoran@cmprlaw.com

Attorneys for Plaintiffs
KINGSBOROUGH ATLAS TREE SURGERY, INC.,
RICHARD KINGSBOROUGH, and
CINDY KINGSBOROUGH

**ELECTRONICALLY FILED**
**Superior Court of California**
**County of Sonoma**
**1/29/2025 4:06 PM**
**By: Angelina Burningham, Deputy Clerk**

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SONOMA

| | |
|---|---|
| KINGSBOROUGH ATLAS TREE SURGERY, INC., a California corporation, RICHARD KINGSBOROUGH, an individual and CINDY KINGSBOROUGH, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>ANVIL POWER, INC., a California corporation, ANVIL EQUIPMENT COMPANY LP, a California limited partnership, ANVIL BUILDERS, a California Corporation, ANVIL HOLDINGS, INC., a California corporation, ANVIL GROUP, LLC, a California limited liability company, ALAN GUY, an individual, and DOES 1-100,<br><br>Defendants. | Case No: 25CV00751<br><br>*(Unlimited Civil)*<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF:**<br><br>1. **BREACH OF CONTRACT;**<br>2. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br>3. **DECLARATORY RELIEF;**<br>4. **INJUNCTIVE RELIEF;**<br>5. **FRAUD (INTENTIONAL MISREPRESENTATION);**<br>6. **NEGLIGENT MISREPRESENTATION;**<br>7. **CONVERSION;**<br>8. **UNFAIR COMPETITION (BUS. & PROFFESSIONS CODE SECTION 17200); AND**<br>9. **ACCOUNTING.**<br><br>**(JURY TRIAL DEMANDED)** |

## <u>INTRODUCTION</u>

1. Plaintiffs, RICHARD KINGSBOROUGH and CINDY KINGSBOROUGH (hereinafter the "Kingsboroughs"), founded Plaintiff, KINGSBOROUGH ATLAS TREE SURGERY, INC. ("KBA"), a Sonoma County based company more than 42 years ago.

2. Over the years, the Kingsboroughs built KBA into a large and successful

CARLE, MACKIE,
POWER & ROSS LLP

1

Case: 25-01008   Doc# 1   Filed: 05/21/25   Entered: 05/21/25 12:04:34   Page 6 of 85
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

company, with hundreds of employees, that specialized in large scale forest and vegetation management projects state-wide.

3.      KBA has invested in millions of dollars' worth of heavy equipment and procured hundreds of millions of dollars' worth of third-party contracts with private and public entities. With full-time certified arborists and experienced construction crews, KBA developed a reputation for tackling complex projects, including heavy commercial related work, utility/wood management, disaster response and forest management.

4.      Plaintiffs met Defendant, ALAN GUY ("Alan Guy"), the CEO of several related entities involved in building and engineering in or about 2019, in connection with potential business opportunities between KBA and Defendants.  Plaintiffs and Defendants envisioned working collaboratively to take advantage of economic opportunities together.

5.      In 2023, Defendants agreed to purchase Plaintiffs' assets including valuable third-party contracts. Defendants agreed to pay cash for the equipment and other business assets to share with Plaintiffs a percentage of profits from the assigned contracts.

6.      Defendants also agreed to pay KBA's paid time off obligations ("PTO") for KBA employees that Defendants hired to work on the multiple contracts assigned by KBA.  Alan Guy represented that KBA's work force, including the Kingsboroughs, would be hired by the Defendants, which would operate "doing business as" Atlas Tree Surgery and Atlas Sonoma Tree (names associated with KBA) to preserve the relationships with KBA's long time clients and customers.

7.      Separately from the asset purchase agreement (the "Agreement") and before the parties executed the Agreement, Defendants loaned KBA $1 Million which is described by Defendants as a line of credit.

8.      After signing the Agreement on June 3, 2023, Defendants hired the KBA workforce, ANVIL EQUIPMENT COMPANY LP ("Anvil Equipment") received and took possession of KBA's equipment, and KBA assigned its valuable third-party contracts to ANVIL POWER, INC. ("Anvil Power").

9.      KBA fully performed but Anvil Power and Anvil Equipment very quickly

breached the Agreement. Defendants failed to pay for most of the equipment they began to use. Defendants suggested they had to keep the equipment off their books and proposed leasing some of the equipment at below market rates.

10. Defendants began paying finance charges on other equipment but refused to pay KBA for its equity in the equipment. To make matters worse, on some equipment (still in their possession) Defendants simply stopped paying on the financed equipment thereby risking repossession of such equipment.

11. Anvil Power and Anvil Equipment, having since fired the KBA employees, including the Kingsboroughs, have attempted to secrete away equipment (without paying for it) and then, despite taking in millions of dollars in revenue on the third-party contracts assigned to Anvil Power, Defendants have failed to pay KBA any of its share of the profits.

12. Defendants - contrary to the spirit of the transaction, the requirements of the Agreement and the promises made to induce the Kingsboroughs - have taken over KBA's business, its assets, its valuable contracts and intellectual property, without paying for such assets and have truly caused economic ruin for KBA, its work force and its owners, the Kingsboroughs.

13. As a result of Defendants' wrongful actions, Plaintiffs have sustained significant financial harm and ongoing damages. By this action, Plaintiffs seek to hold Defendants liable and accountable for their wrongdoing and will ask for an award of damages against Defendants in excess of $60 Million.

## THE PARTIES

14. Plaintiff, KINGSBOROUGH ATLAS TREE SURGERY, INC., is a California corporation, doing business in Sonoma County, California ("KBA").

15. Plaintiff, RICHARD KINGSBOROUGH ("Richard Kingsborough"), is an individual residing in Sonoma County, California.

16. Plaintiff, CINDY KINGSBOROUGH ("Cindy Kingsborough"), is an individual residing in Sonoma County, California.

17. Defendant, ANVIL POWER, INC., is a California corporation ("Anvil Power").

18. Defendant, ANVIL EQUIPMENT COMPANY LP, is a California limited

Case: 25-01008   Doc# 1   Filed: 05/21/25   Entered: 05/21/25 12:04:34   Page 8 of 85

partnership, ("Anvil Equipment").

19.     ANVIL BUILDERS, INC., is a California corporation, ("Anvil Builders").

20.     Defendant, ANVIL HOLDINGS, INC., is a California corporation, ("Anvil Holding").

21.     Defendant, ANVIL GROUP, LLC, is a California limited liability company, and general partner of Anvil Equipment ("Anvil Group").

22.     Anvil Power, Anvil Equipment, Anvil Builders, Anvil Holdings, Anvil Group and all subsidiary and related entities are herein collectively referred to as "Anvil" or the "Anvil Entities."

23.     Defendant, ALAN GUY, is a California resident, and is Chief Executive Officer of Anvil Power, Anvil Builders, Anvil Holdings, and a managing member of Anvil Group.

24.     The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants Does 1 through 100, inclusive, are unknown to Plaintiffs at the present time. Plaintiffs therefore sues said Defendants by such fictitious names and will seek leave of Court to amend this Complaint to set forth their true names and capacities thereof, when the same has been ascertained.

25.     Defendants, and each of them, were and are the agents, servants, representatives, and/or employees of each of the other Defendants herein and were at all times acting within the course and scope of such agency, representation and employment, and with the permission and consent of each of said Defendants.

26.     Plaintiffs are informed and believe, and upon such information and belief alleges, that each of the Defendants, including Does 1 through 100, inclusive, were, at all times herein mentioned, acting in concert with, and/or in conspiracy with, each and every one of the remaining Defendants.

27.     Wherever appearing in this Complaint, each and every reference to Defendants and to any of them, is intended to be and shall be a reference to all Defendants hereto, and to each of them, named and unnamed, including all fictitiously named Defendants, unless said reference is otherwise specifically qualified.

CARLE, MACKIE,
POWER & ROSS LLP

4

Case: 25-01008   Doc# 1   Filed: 05/21/25   Entered: 05/21/25 12:04:34   Page 9 of 85
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## JURISDICTION AND VENUE

28. Jurisdiction is proper in the State of California because the events giving rise to each and every single cause of action set forth herein occurred within the State of California. Additionally, the agreement at issue in this dispute was drafted and executed in the State of California, and performance on such agreement occurred or was supposed to occur in the County of Sonoma, State of California. Defendants have sufficient contacts within the State of California such that they are subject to the jurisdiction of this state.

29. Venue in Sonoma County is proper because the agreement that is the subject of this Complaint was entered into and performed (or should have been performed) in the County of Sonoma, State of California.

## GENERAL ALLEGATIONS

30. On or about June 5, 2023, KBA and the Kingsboroughs entered into a written agreement, entitled Asset Purchase Agreement, with Anvil Power and Anvil Equipment (hereinafter the "Agreement").

31. In the Agreement, KBA and the Kingsboroughs agreed to sell all of KBA's and the Kingsboroughs' right, title, and interest in tangible and intangible assets, properties, and rights belonging to KBA and the Kingsboroughs, and Anvil Power agreed to purchase such assets (described in the Agreement as the "Anvil Power Purchased Assets"). A true and correct copy of the Agreement is attached hereto as Exhibit A.

32. The Anvil Power Purchased Assets are defined in the Agreement as follows: (i) assignable agreements between KBA and third-party entities, including such entities as Pacific Gas & Electric Co. ("PG&E"), all of whom KBA developed business relationships with over many years of doing business in Northern California. The agreements with third-party entities, who did business with KBA assigned to Anvil are referred to herein as the "Assigned Contracts"; (ii) all KBA related tradenames, trademarks, websites and business telephone numbers; (iii) all goodwill and going concern value; (iv) insurance policies (including but not limited to general liability, equipment and vehicle insurance, and workers' compensation) including those policies that are designated by Anvil Power in writing, if any, that satisfy requirements of Assigned

CARLE, MACKIE, POWER & ROSS LLP

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Contracts, e.g., PG&E's requirements (referred to in the Agreement as the "Assigned Insurance Policies"), or that satisfy requirements for ownership and use of Anvil Power Purchased Assets; and (v) all small tools etc. (e.g., chainsaws, safety gear, etc.).

33. Anvil Power also agreed to assume certain liabilities of KBA (referred to as the "Anvil Power Assumed Liabilities"), which include all liabilities related to the Assigned Contracts, the Assigned Insurance Policies as well as accrued Paid Time Off (PTO) and vacation liabilities with respect to KBA employees hired by Anvil.

34. In consideration for the foregoing sale and purchase of assets by Anvil Power, in addition to assuming certain liabilities, Anvil Power agreed to pay KBA $690,000, and a percentage of Anvil's net profit from the Assigned Contracts over a five-year period.

35. Net profits are defined in the Agreement and include equipment used in connection with Assigned Contracts, to be charged to jobs at Anvil Power's internal rates which Anvil has represented to be lower than market rates. Under the Agreement, Anvil's net profits on the Assigned Contracts are to be determined in accordance with generally accepted accounting principles by an independent certified public accountant.

36. Within one hundred twenty (120) days after the end of each year under the Agreement, Anvil Power is required to deliver to KBA and the Kingsboroughs a calculation of net profits from the Assigned Contracts, together with payment as required under the Agreement, and with regard to which KBA and the Kingsboroughs shall have the right, after not less than ten (10) business days' prior notice, to inspect books and records and all other documents and material, in whatever form, that are in the possession of or under the control of Anvil and its related entity, Anvil Builders and any other affiliates of Anvil necessary to calculate Anvil's net profits on the Assigned Contracts.

37. In the Agreement, KBA and the Kingsboroughs also agreed to sell all of KBA and the Kingsboroughs' rights, title, and interests in, machinery, tools, vehicles (excluding personal vehicles), office equipment, and other tangible personal property, wherever located, designated by written notice from Anvil Equipment, and to deliver, assign, transfer, such property to Anvil Equipment. Such property is collectively referred to as the "Anvil Equipment Purchased

CARLE, MACKIE,
POWER & ROSS LLP

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Assets."

38.     The aggregate purchase price for the Anvil Equipment Purchased Assets (the "Anvil Equipment Purchase Price") is defined in the Agreement as "determined by Buyers and Seller after reviewing the Ritchie Brothers Auctioneers valuation and the FLV values set forth in the California Bank of Commerce valuation, provided that the Anvil Equipment Purchase Price shall not exceed Thirty Million dollars $30,000,000."

39.     Pursuant to the Agreement KBA immediately within days of June 5, 2023, assigned over to Anvil Power and relinquished control over the Assigned Contracts, Intellectual Property, including trademarks, trade secrets, including website, email and telephone numbers (hereinafter after "IP") and has otherwise been cooperating with Anvil in every regard required by the Agreement.

40.     Pursuant to the Agreement, Anvil Equipment identified and selected KBA equipment and KBA made such equipment available for Anvil's use and delivered it to Anvil. Pursuant to the Agreement, Anvil has taken possession of tens of millions of dollars' worth of heavy equipment and is using such equipment or has possession of such equipment.

41.     As a result of KBA's performance under the Agreement, over the last 18 months, Anvil has enjoyed all of the benefits of the Agreement and in particular has received revenue, on information and belief, from the Assigned Contracts in excess of $80 Million in 2023 and in excess of $100 Million in 2024.

42.     However, for its part, Anvil has failed and refused to perform under the Agreement and has denied KBA from enjoying the primary benefits under the Agreement, including completion of the purchase of KBA's equipment and payment of a percentage Anvil's net profits generated from the several Assigned Contracts. These benefits promised by Anvil were and are the primary inducement for KBA to enter into the Agreement with Anvil.

43.     In addition to the foregoing breaches by Anvil, despite having access to KBA's equipment and the benefit of the Assigned Contracts, Anvil has unreasonably delayed the closing as set forth in the Agreement. Despite a draft closing memorandum which identified equipment to be sold to Anvil (including many items of equipment currently in use by Anvil or in its

CARLE, MACKIE,
POWER & ROSS LLP

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

possession) and the short window to close, formal closing has yet to occur.

44. Further, rather than purchasing KBA equipment as required by the Agreement, Anvil has sought to lease some equipment at a below market rate. The reason given by Anvil for this practice is that it cannot make a profit leasing the equipment at market rates and they say that they need to keep certain equipment assets off its books.

45. Anvil's attempt to characterize the use of equipment as leased equipment is clearly in bad faith and a breach of the Agreement. KBA has attempted to work with Anvil as an accommodation to Anvil but has not agreed to modify the Agreement and has not agreed on below market lease rates.

46. Despite KBA's accommodation, Anvil has failed and refused to pay market rates and in fact is no longer making any lease payments on equipment, most of which Anvil continues to use. The fair rental value for equipment that Anvil proposed to lease and which Anvil continues to use or maintains in its possession custody and control to date exceeds $21 Million.

47. KBA is now informed and believes that even though Anvil sought to lease certain equipment from KBA, it is still expensing the same equipment internally at an inflated rate. Anvil is using equipment on Assigned Contract projects without having first paid for it and then expensing it on its books at an inflated amount thereby reducing its profit on the Assigned Contract. This is a fraudulent scheme designed to reduce its profits on Assigned Contracts.

48. Further, with respect to other equipment for which KBA was still making finance payments, Anvil assumed some of those payments but failed to pay KBA for its equity in such equipment.

49. Further, Anvil has treated certain vendor payments it has been required to pay in connection with the Assigned Contracts as loans to KBA and has wrongfully added such amounts to the so-called letter of credit thereby wrongfully increasing the amount of KBA's debt to Anvil.

50. Lastly, Anvil has ceased making financing payments on certain equipment in its possession, custody and control (over which it had previously assumed) putting KBA in jeopardy

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

of having such equipment repossessed at great loss to KBA.

51.     In addition to the foregoing attempts at leasing certain property or assuming the underlying financing, Anvil has also taken possession of other KBA owned property equipment treating it as purchased property without having paid KBA pursuant to the Agreement.

52.     For example, on at least one occasion, Anvil applied for and received $79,000 in insurance benefits (replacement costs) for a vehicle totaled in an accident. The vehicle, however, was never paid for by Anvil and is still registered to KBA and thus, the insurance proceeds belong to KBA.

53.     In addition, Anvil destroyed an expensive item of equipment known as a tub grinder that it had not yet purchased from KBA worth $1.4 Million. Anvil has not compensated KBA for this destroyed equipment.

54.     Anvil's treatment of KBA equipment as either leased property or purchased property depending on what best suits its financial needs, is a breach of the Agreement and has resulted in significant damages to KBA.

55.     Anvil has also caused KBA to sustain significant financial damages by its failure to account and to pay KBA its share of net profits received by Anvil as a result of the PG&E contract and other Assigned Contracts.

56.     In particular, Anvil has greatly benefited from KBA's assignment of the PG&E contract. By its own admission, KBA is informed and believes that Anvil has received in excess of $67 Million in 2023, and $87 Million in 2024, as a result of the PG&E contract without any accounting to KBA.

57.     KBA is informed and believes that Anvil set up another subsidiary, known as GASS, to operate a  traffic control entity to manage traffic related expenses. KBA is informed and believes that in the first 18 months of the Agreement, Anvil has billed and received from PG&E in excess of $10 Million in revenue related to such expenses with very little by way of overhead.

58.     Despite clear language in the Agreement, Anvil has not accounted to KBA for any of this revenue (from the PG&E contract or any of the Assigned Contracts) and has not paid

Case: 25-01008    Doc# 1    Filed: 05/21/25    Entered: 05/21/25 12:04:34    Page 14 of 85

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

CARLE, MACKIE,
POWER & ROSS LLP

KBA anything as a result of the Assigned Contracts.

59. Anvil's failure to perform and its attempts at revising the nature of the Agreement is symptomatic of Anvil's approach to its obligations under the Agreement and the manner in which Anvil describes its relationship with KBA. For example, the Agreement is plainly an asset purchase agreement. As described above, Anvil has attempted to refashion the Agreement into one in which Anvil can pick and choose between leasing or purchasing.

60. For reasons that only Anvil understands, Anvil has on multiple occasions referred to its arrangement with KBA as a merger of two different business entities. Anvil went as far as to register fictitious business name statements. One is for Anvil Power doing business as Atlas Tree Surgery. Another is for Anvil Builders doing business as Atlas Sonoma Tree. The representation that there is a merger or that Anvil is doing business as a KBA entity has been made to members of the public, to PG&E and to KBA's own employees (whom Anvil invited to join Anvil as employees).

61. In addition to making such representations and inviting KBA employees to join Anvil, Anvil represented to PG&E that it would maintain Rich Kingsborough as a member of the Anvil management and maintain the KBA Training Program as part of Anvil's business model in the utility space.

62. Despite representing to KBA that it would hire KBA employees, Rich Kingsborough and Cindy Kingsborough, Anvil did so only for a short window for appearances sake only and quickly terminated the KBA employees it hired and systematically removed the Kingsboroughs from Anvil employment.

63. Anvil used the perception of KBA's employees continuing with Anvil, including Rich and Cindy Kingsborough's participation solely for its benefit in bad faith and quickly discarded them when it was no longer necessary to keep up the appearance that it had taken on KBA employees.

64. Also, and even more glaring, despite agreeing to pay certain PTO obligations to KBA employees, after Anvil eliminated KBA personnel that had previously been offered jobs and replaced KBA managers with Anvil employees, Anvil failed to pay the PTO obligations for

Case: 25-01008   Doc# 1   Filed: 05/21/25   Entered: 05/21/25 12:04:34   Page 15 of 85

KBA employees as agreed.

65.     As a result of Anvil's pretense of hiring KBA employees and using KBA's name only to quickly terminate KBA employees, Anvil has harmed KBA's reputation in the business community.

66.     Plaintiffs are informed and believe that Anvil has failed to respond and to follow up with clients, some of whom had open projects, while doing business as Atlas Tree Surgery and Atlas Sonoma Tree (names associated with KBA). This has also caused significant harm to KBA's reputation in the business community.

67.     Moreover, KBA has incurred mounting debt under a so-called line of credit created by Anvil and managed by Anvil Builders that is purportedly for the benefit of KBA. Anvil did pay certain legitimate debts of KBA at the outset of the Parties' relationship (as agreed upon by the Parties) that were not part of the consideration in the Agreement. Anvil then described the payments as creating a line of credit and asked the Kingsboroughs to execute deeds of trust to secure the debt.

68.     But Anvil did not fully disclose its intentions with the deed of trusts and thus, the request to execute deeds of trust was done under false pretenses. Anvil did not inform the Kingsboroughs that Anvil would add to the line of credit's principal balance amounts paid by Anvil to third-party vendors in connection with the Assigned Contracts. Plaintiffs did not and would not agree to taking on such debt as those obligations became Anvils as assignees of the Assigned Contracts.

69.     Rather than making payments to KBA as required by the Agreement that would eliminate the line of credit, Anvil has increased the balance outstanding on this so-called loan by attributing finance payments made by Anvil on equipment (that Anvil should have rightfully purchased) as a loan to KBA. Anvil is now threatening to wrongfully foreclose on the deeds of trust the Kingsboroughs provided in good faith at Anvil's request.

70.     Anvil has abused this so-called line of credit to the detriment of KBA and the Kingsboroughs.

71.     On or about January 9, 2025, KBA made a demand on Anvil to account for its

Case: 25-01008   Doc# 1   Filed: 05/21/25   Entered: 05/21/25 12:04:34   Page 16 of 85

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

CARLE, MACKIE,
POWER & ROSS LLP

income and profit from Assigned Contracts, to produce its books and records as required by the Agreement, to complete the purchase of KBA equipment pursuant to the Agreement or return such equipment to KBA, to make past due lease payments on equipment Anvil offered to lease, in an amount in excess of $21 Million and to proceed to arbitration.

72. Anvil responded and to date Anvil has refused all of Plaintiffs' demands.

73. In fact rather that complying with its obligations to account and to produce its books and records or its obligations to pay for the equipment in its possession and which it continues to use on projects under the Assigned Contracts, Anvil has doubled down, making false allegations of frauds and wrongdoing against the Kingsboroughs and their family and the family of other KBA managers in a transparent effort to harass and intimate the Kingsboroughs directly even though Anvil and Alan Guy know the Kingsboroughs are represented to by counsel.

74. Lastly, despite KBA's request that Anvil produce its books and records and demand that Anvil pay for KBA's equipment and Assigned Contracts, Anvil is now attempting to secret and remove KBA owned equipment to an undisclosed location despite KBA's request that such equipment be paid for or returned to KBA.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

75. Plaintiffs re-allege and incorporate into this cause of action each and every factual allegation within the prior paragraphs, as if the same were fully set forth herein.

76. The Agreement requires Anvil to pay KBA for the equipment it designates, uses and maintains in is possession. The Agreement requires Anvil to pay KBA a percentage of net profits generated by the Assigned Contracts and to account to KBA for such profits.

77. Moreover, under the Agreement, the Kingsboroughs have the right, after not less than ten (10) business days' prior notice, to inspect books and records and all other documents and material, in whatever form, that are in the possession of or under the control of Anvil and its related entity, Anvil Builders and any other affiliates of Anvil necessary to calculate Anvil's net profits on the Assigned Contracts.

CARLE, MACKIE, POWER & ROSS LLP

12

Case: 25-01008 Doc# 1 Filed: 05/21/25 Entered: 05/21/25 12:04:34 Page 17 of 85
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

78.     Under the Agreement if such an inspection reveals an underpayment, Anvil is required to immediately repay KBA and the Kingsboroughs the amount of any underpayment discovered plus interest at an annual rate of ten percent (10%) prorated by the number of days from the original payment date to the repayment date.

79.     KBA has demanded that Anvil perform and purchase KBA's equipment, pay KBA its share of net profits on Assigned Contracts and account and produce its books and records as required by the Agreement.

80.     KBA has requested Anvil produce its books and records or make the same available to KBA.

81.     Anvil has breached the Agreement by failing and refusing to pay for KBA's equipment (by keeping certain equipment and property and proposing to lease the same and by failing and refusing to make lease payments to KBA), by failing to pay any amount of its net profits to KBA on the Assigned Contracts, by failing and refusing to account for its net profits under the Assigned Contracts.  Finally, Anvil is secreting equipment owned by KBA and removing it to an undisclosed location to the detriment and damage of Plaintiffs.

82.     To date, Plaintiffs have fully performed all conditions, covenants, and promises to be performed by them under the Agreement, except those that have been excused.

83.     Accordingly, Defendants have materially breached the Agreement.  As a proximate result of the breach of the Agreement by Defendants, as herein alleged, Plaintiffs have been damaged in an amount to be proven at time of trial, which sum is in excess of the jurisdictional amount of this Court.

## SECOND CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

84.     Plaintiffs re-allege and incorporate into this cause of action each and every factual allegation within the prior paragraphs, as if the same were fully set forth herein.

85.     Defendants entered into the Agreement, a valid and enforceable contract.

86.     To date, the Plaintiffs have fully performed all conditions, covenants, and promises to be performed under the Agreement, except those that have been excused.  And all

conditions required for Defendants' performance occurred: namely, that Plaintiffs delivered equipment to Defendants who in turn used such equipment for the work on the Assigned Contracts. Plaintiffs have also assigned the Assigned Contracts to Defendants per the Agreement. Defendants have commenced work on such Assigned Contracts and received revenue on such projects. Therefore, Defendants are required to perform pursuant to the Agreement and pay Plaintiffs accordingly.

87. Defendants' refusal to comply with the Agreement has prevented Plaintiffs from receiving the benefits of the Agreement. Defendants' actions and omissions and failures to perform given the circumstances as described hereinabove are unfair and in bad faith.

88. As a proximate result of Defendants' bad faith conduct, as herein alleged, Plaintiffs have been damaged in an amount to be proven at time of trial, which sum is in excess of the jurisdictional amount of this Court.

## THIRD CAUSE OF ACTION

### (Declaratory Relief)

89. Plaintiffs re-allege and incorporate into this cause of action each and every factual allegation within the prior paragraphs, as if the same were fully set forth herein.

90. An actual controversy has arisen and now exists between Plaintiffs and Defendants as alleged herein, concerning their respective rights and duties owed under the Agreement including the obligation by Defendants to account to Plaintiffs for net profits associated with the Assigned Contracts and Anvil's creation and use of a so-called line of credit secured by deeds of trust.

91. Defendants' use of this so-called line of credit is wrongful and fraudulent as Defendants have used it to saddle Plaintiffs with debt based on payments Defendants have made on finance accounts for vehicles and equipment belonging to Plaintiff KBA that Defendants have in their possession and which Defendants are contractually obligated to purchase.

92. Defendants' conduct as herein described in connection with the so-called line of credit and deeds of trust have caused Plaintiffs significant financial injury.

93. Plaintiffs request a judicial determination declaring that the line of credit created

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

CARLE, MACKIE,
POWER & ROSS LLP

by Defendants and deeds of trust defendants obtained from the Kingsboroughs to secure such debt are hereby null and void.

94. Defendants' conduct as herein described regarding Defendants' failure and refusal to account for net profits associated with the Assigned Contracts has caused Plaintiffs significant financial injury.

95. Plaintiffs request a judicial determination declaring that Defendants must account for their net profits under the Agreement and pay Plaintiff KBA its percentage of such net profits as required under the Agreement.

96. A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiffs may ascertain their rights and Defendants' duties under the Agreement.

## FOURTH CAUSE OF ACTION

### (Injunctive Relief)

97. Plaintiffs re-allege and incorporate into this cause of action each and every factual allegation within the prior paragraphs, as if the same were fully set forth herein.

98. Defendants now threaten to sell equipment, property and valuable IP to undisclosed third parties that Defendants have failed to pay pursuant to the Agreement as a means of attempting to coerce and threaten Plaintiffs. This includes customer lists compiled by Plaintiff KBA that are not included in the assets sold and over which Defendants alleged ownership.

99. Plaintiffs are informed and believe, and on that basis allege, that unless Defendants are restrained and enjoined by an order from this Court from selling or possessing and using such property, equipment and IP that Defendants have failed to pay for and are refusing to pay for as required under the Agreement, or such items that do not belong to Defendants and were not part of the Agreement, e.g., KPA customer lists, Plaintiffs will sustain significant and irreparable permanent financial injury.

100. The threat of such irreparable and permanent damage justifies the issuance by this Court of a permanent injunction expressly authorized by Code of Civil Procedure Section 526.

Monetary relief may not adequately compensate Plaintiffs for harm that could otherwise be enjoined.

101. Plaintiffs have no adequate remedy at law for the injuries that Plaintiffs have suffered and will continue to suffer in the future without injunctive relief.

102. Plaintiffs are likely to prevail on the merits of the breach of contract claim, as Defendants are clearly in breach of the Agreement.

103. Plaintiffs thus requests a court order preliminarily and permanently enjoining Defendants, their agents, servants, and employees, and all persons acting under, in concert with, or for them from possessing and utilizing equipment and property that Defendants have not paid for that belong to Plaintiffs.

104. Plaintiffs further requests a court order preliminarily and permanently requiring Defendants to take all action necessary, including securing, maintaining in good repair all equipment and property belonging to Plaintiffs that have not been paid for by Defendants and to return such equipment and property to Plaintiffs without delay.

105. Plaintiffs further requests a court order preliminarily and permanently enjoining Defendants from interfering in any manner with Plaintiffs' rights to the property, including IP and equipment referenced herein, including an order prohibiting the sale or transfer of Plaintiffs property, equipment, or assets of any kind, including IP in Defendants' possession, custody or control.

## **FIFTH CAUSE OF ACTION**

### **(Intentional Misrepresentation - Fraud)**

106. Plaintiffs re-allege and incorporate into this cause of action each and every factual allegation within the prior paragraphs, as if the same were fully set forth herein.

107. In negotiating the Agreement and describing the Agreement and the intent of the Agreement after execution, Defendants including, Alan Guy represented that: (a) Anvil would and intended to hire Plaintiff KBA's work force including members of the Kingsborough family; (b) that Anvil would pay such employees PTO obligations of Plaintiff KBA; (c) that the Agreement was a merger between two parties; (d) that Defendants relied on KBA's reputation

CARLE, MACKIE, POWER & ROSS LLP

16

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

and standing in the community to perform on the Assigned Contracts.

108. In negotiating the Agreement and describing the Agreement and the intent of the Agreement after execution, Defendants including Alan Guy represented that Anvil would pay certain employment expenses incurred by KBA in advance of the Agreement and that it would account for such expenses as a loan to KBA (described as a line of credit). Defendants requested and further represented that the Kingsboroughs' deeds of trusts would be used to secure such payments made by Anvil on KBA's behalf.

109. The representations by Defendants and Alan Guy were false when they made them and the Defendants and Alan Guy knew that the representations were false and/or the Defendants or Alan Guy made such representations recklessly and without regard for their truth. The Defendants and Alan Guy never intended to perform according to the terms of the Agreement and especially their promises regarding employment of KBA employees, including members of Kingsborough family were made by Alan Guy to induce Plaintiffs to enter into the Agreement with Defendants.

110. The Defendants made the representations with the intention that the Plaintiffs would rely on them. Namely, the Defendants made the representations to induce the Plaintiffs to enter into the Agreement and assign the Assigned Contracts and to deliver Plaintiffs' equipment and vehicles, and IP to Defendants.

111. The Defendants made the forgoing representations to induce the Plaintiffs to enter into the Agreement.

112. The Plaintiffs reasonably relied on the Defendants' representations in executing and performing pursuant to the Agreement.

113. Accordingly, as a result of the false representations as described herein, the Plaintiffs have been damaged in an amount to be proven at the time of trial, which sum is in excess of the jurisdictional amount of this Court.

114. The Plaintiffs' reliance on the Defendants' representations was a substantial factor in causing their harm.

115. Defendants' knowing and intentional misrepresentations of the facts was

oppressive, fraudulent, and malicious. Pursuant to California Civil Code, section 3294, Plaintiffs are entitled to an award of exemplary/punitive damages from Defendants in an amount appropriate to punish Defendants for this conduct.

**SIXTH CAUSE OF ACTION**

**(Negligent Misrepresentation)**

116. Plaintiffs re-allege and incorporate into this cause of action each and every factual allegation within the prior paragraphs, as if the same were fully set forth herein.

117. In negotiating the Agreement and describing the Agreement and the intent of the Agreement after execution, Defendants including Alan Guy represented that: (a) Anvil would and intended to hire Plaintiff KBA's work force including members of the Kingsborough family; (b) that Anvil would pay such employees PTO obligations of Plaintiff KBA; (c) that the Agreement was a merger between two parties; and (d) that Defendants relied on the KBA's reputation and standing in the community to perform on the Assigned Contracts.

118. In negotiating the Agreement and describing the Agreement and the intent of the Agreement after execution, Defendants including Alan Guy represented that Anvil would pay certain employment expenses incurred by KBA in advance of the Agreement and that they would account for such expenses as a loan to KBA (described as a line of credit). Defendants requested and further represented that the Kingsboroughs' deeds of trusts would be used to secure such payments made by Anvil on KBA's behalf.

119. The representations by Defendants and Alan Guy were false when they made them and the Defendants and Alan Guy knew that the representations were false and/or the Defendants or Alan Guy made such representations recklessly and without regard for their truth. The Defendants and Alan Guy never intended to perform according to the terms of the Agreement and especially that promises regarding employment of KBA employees was made to induce Plaintiffs to enter into an agreement with Defendant.

120. The Defendant made the representations with the intention that the Plaintiffs would rely on them. Namely, the Defendants and Alan Guy made the representations to induce the Plaintiffs to enter into the Agreement and assign the Assigned Contracts and to deliver

Plaintiffs' equipment and vehicles to Defendants.

121. The Defendants did so to induce the Plaintiffs to enter into the Agreement.

122. The Plaintiffs reasonably relied on the Defendants' representations in executing and performing pursuant to the Agreement.

123. The Plaintiffs would not have entered into the Agreement if they had known that the representations were not true.

124. Accordingly, the Plaintiffs have been damaged in an amount to be proven at the time of trial, which sum is in excess of the jurisdictional amount of this Court.

125. The Plaintiffs' reliance on the Defendants' representations was a substantial factor in causing their harm.

## SEVENTH CAUSE OF ACTION

### (Conversion)

126. Plaintiffs re-allege and incorporate into this cause of action each and every factual allegation within the prior paragraphs, as if the same were fully set forth herein.

127. By taking possession of millions of dollars' worth of equipment and property belonging to Plaintiffs without paying for such equipment and property as described herein above, including the secreting of equipment away and hiding the same from Plaintiffs after Plaintiffs' demands on Defendants to pay for or return such equipment and property, Defendants have engaged in conversion.

128. By engaging in the conduct described herein above, Defendants have substantially interfered with Plaintiffs' property rights by knowingly or intentionally refusing to return the equipment, vehicles and other property and rights after Plaintiffs made demand on Defendants to return such property and rights after Defendants failed and have refused to pay Plaintiffs for such property and rights.

129. Plaintiffs did not consent to Defendants' conduct as described herein, and this conduct was a substantial factor in Plaintiffs' harm.

130. As a result of the Defendants' conversion, Plaintiffs have been damaged in an amount to be determined at trial.

131.    Defendants' knowing and intentional misrepresentations of the facts was oppressive, fraudulent, and malicious.  Pursuant to California Civil Code, section 3294, Plaintiffs are entitled to an award of exemplary/punitive damages from Defendants in an amount appropriate to punish Defendants for this conduct.

## EIGHTH CAUSE OF ACTION

### (Unfair Competition)

132.    Plaintiffs re-allege and incorporate into this cause of action each and every factual allegation within the prior paragraphs, as if the same were fully set forth herein.

133.    Defendants' aforesaid conduct constitutes unfair, unlawful, and fraudulent business practices in violation of California Business & Professions Code Sections 17200.

134.    Anvil's use of Plaintiffs' assets, equipment, IP (including business name) and millions of dollars' worth of contracts without paying for such property and rights to build its business and to ruin Plaintiffs' business and reputation as described herein, is unlawful and fraudulent and constitutes unfair competition.

135.    As a direct and proximate result of the fraudulent, unfair and illegal conduct and misappropriation of Plaintiffs' property and rights by Defendants and fraudulent imposition of debt on Plaintiffs as herein alleged, Plaintiffs have been damaged in an amount not yet ascertained and continue to be damaged.

136.    These wrongful acts as described herein have proximately caused and/or will continue to cause Plaintiffs substantial injury, wrongful association, harm to their reputation, dilution of their goodwill, and diminution in value of its trade name and unjust enrichment. These actions cause imminent irreparable harm and injury to Plaintiffs.

137.    As a result of Defendants' wrongful conduct, Plaintiffs are entitled to recover from Defendants the gains, profits, and advantages Defendants have obtained as a result of such wrongful acts as hereinabove alleged and said amounts should be disgorged and restitution made to Plaintiffs.

/ / /

/ / /

## NINTH CAUSE OF ACTION

### (Accounting)

138.    Plaintiffs re-allege and incorporate by reference and incorporate into this cause of action each and every factual allegation within the prior paragraphs, as if the same were fully set forth herein.

139.    As noted above, Plaintiffs have made demand on Defendants to account for net profits earned under the Assigned Contracts as required under the Agreement and Defendants have, to date, failed and refused to do so.

140.    Plaintiffs seek an accounting as well as to the location and condition of all equipment, vehicles and other property in Defendants' possession, custody and control.

141.    Defendants should provide an accounting of all net profits earned from the Assigned Contracts to date and the Court should enter an order awarding Plaintiff KBA its percentage share of such net profits pursuant to the Agreement.

### PRAYER FOR RELIEF

WHEREAS, based on the foregoing factual allegations and causes of action asserted herein, Plaintiffs pray for the following relief against all Defendants, jointly and severally:

1.    For general, special, consequential, and compensatory damages in an amount to be proven at trial;

2.    For punitive and exemplary damages in an amount to be proven at trial;

3.    For an Order providing temporary and permanent injunctive relief as follows:

    a.    Requiring Defendants to take all action necessary, including accounting for, securing, maintaining in good repair all property, equipment and assets belonging to Plaintiffs and to return such property, equipment and other assets to Plaintiffs without delay;

    b.    Prohibiting the sale or transfer by Defendants of property, equipment and other assets of any kind in Defendants' possession, custody or control that belong to Plaintiffs;

4.    For an accounting of the location and condition of equipment and other property

CARLE, MACKIE, POWER & ROSS LLP

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

in Defendants' possession, custody and control subject to the Agreement;

5. For an accounting of Defendants' profits in connection with the Assigned Contracts;

6. For a judicial determination declaring that the line of credit created by Defendants and deeds of trust Defendants demanded the Kingsboroughs provide to secure such debt are hereby null and void;

7. For a judicial determination declaring that Defendants must account for their net profits under the Agreement with regard to the Assigned Contracts and pay Plaintiff KBA its percentage of such net profits as required under the Agreement;

8. For an award of attorneys' fees and costs;

9. For pre-judgment interest as permitted by law; and

10. For such other relief as the Court deems just and proper.


Dated: January 29, 2025                    CARLE, MACKIE, POWER & ROSS LLP



By: _____
Philip J. Terry
Kimberly Corcoran
Attorneys for Plaintiffs
KINGSBOROUGH ATLAS TREE
SURGERY, INC., RICHARD
KINGSBOROUGH, and
CINDY KINGSBOROUGH

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

# EXHIBIT 2

1  Philip J. Terry (SBN 148144)
   Kimberly Corcoran (SBN 148229)
2  CARLE, MACKIE, POWER & ROSS LLP
   100 B Street, Suite 400
3  Santa Rosa, California 95401
   Telephone: (707) 526-4200
4  Facsimile: (707) 526-4707
   pjterry@cmprlaw.com
5  kcorcoran@cmprlaw.com

6  Attorneys for Plaintiffs
   KINGSBOROUGH ATLAS TREE SURGERY, INC.,
7  RICHARD KINGSBOROUGH, and
   CINDY KINGSBOROUGH

8

9              SUPERIOR COURT OF CALIFORNIA

10                  COUNTY OF SONOMA

11  KINGSBOROUGH ATLAS TREE                 Case No:  25CV00751
    SURGERY, INC., a California corporation;
12  RICHARD KINGSBOROUGH, an                *(Unlimited Civil)*
    individual and CINDY KINGSBOROUGH,
13  an individual,                          **FIRST AMENDED COMPLAINT FOR
                                            DAMAGES AND INJUNCTIVE RELIEF:**
14                      Plaintiffs,
                                            1.  **BREACH OF CONTRACT;**
15          v.                              2.  **BREACH OF THE IMPLIED
                                                COVENANT OF GOOD FAITH AND
16  ANVIL POWER, INC., a California             FAIR DEALING;**
    corporation; ANVIL EQUIPMENT           3.  **UNFAIR COMPETITION (BUS. &
17  COMPANY LP, a California limited            PROFFESSIONS CODE SECTION
    partnership; ANVIL BUILDERS, a             17200);**
18  California Corporation; ANVIL          4.  **CONVERSION;**
    HOLDINGS, INC., a California corporation;  5.  **FRAUD (INTENTIONAL
19  ANVIL GROUP, LLC, a California limited      MISREPRESENTATION);**
    liability company; ALAN GUY, an        6.  **NEGLIGENT
20  individual; RICHARD J. LEIDER, an          MISREPRESENTATION;**
    individual, and DOES 1-100,            7.  **CONSPIRACY TO DEFRAUD;**
21                                          8.  **ACCOUNTING;**
                        Defendants.         9.  **DECLARATORY RELIEF; AND**
22                                          10. **INJUNCTIVE RELIEF**

23                                          **(JURY TRIAL DEMANDED)**

24                                          Complaint filed:  January 29. 2025

25                                          Assigned For All Purposes:
                                            Hon. Jane Gaskell
26

27                      **INTRODUCTION**

28      1.      Plaintiffs, RICHARD KINGSBOROUGH and CINDY KINGSBOROUGH

(hereinafter the "Kingsboroughs"), founded Plaintiff, KINGSBOROUGH ATLAS TREE SURGERY, INC. ("KBA"), a Sonoma County based company, more than 42 years ago.

2. Over the years, the Kingsboroughs built KBA into a large and successful company, with hundreds of employees, that specialized in large scale forest and vegetation management projects state-wide.

3. KBA has invested in millions of dollars' worth of heavy equipment and procured tens of millions of dollars' worth of third-party contracts with private and public entities.

4. KBA's expertise includes complex heavy commercial work, utility/wood management, disaster response and forest management, utilizing certified arborists and experienced construction crews.

5. The Kingsboroughs met Defendant, ALAN GUY ("Alan Guy"), in or about 2019, in connection with potential business opportunities involving KBA and Defendants. The Kingsboroughs and Alan Guy envisioned working collaboratively to take advantage of economic opportunities together.

6. In 2023, Defendants, Anvil Power, Inc. ("Anvil Power"), and Anvil Equipment Company, LP ("Anvil Equipment"), agreed to purchase KBA's assets, including valuable third-party contracts. Defendants agreed to pay cash and a percentage of profits from the contracts assigned by KBA to Defendants, ("Agreement"). A copy of the Agreement dated June 5, 2023, is attached hereto as **Exhibit A**

7. As part of the Agreement, Alan Guy represented and Defendants agreed to hire KBA's employees (including the Kingsboroughs and members of their family) to work on the multiple contracts assigned by KBA to Defendants and to pay KBA's paid time off obligations ("PTO") for KBA employees that Defendants hired.

8. Alan Guy advised that Defendants planned on operating "doing business as" Atlas Tree Surgery and Atlas Sonoma Tree (names associated with KBA) to preserve the relationships with KBA's long time clients.

9. Separate from the Agreement, Alan Guy represented that Defendant Anvil Builders, Inc. ("Anvil Builders") would loan KBA approximately $1 Million for payroll

CARLE, MACKIE,
POWER & ROSS LLP

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

expenses. Defendant, Anvil Builders, prepared a line of credit agreement to account for advances to KBA (the "LOC").

10. A copy of the LOC, also dated June 5, 2023, and furnished by Defendants to KBA is attached hereto as **Exhibit B**.

11. After signing the Agreement on June 5, 2023, Defendants hired the KBA workforce, Anvil Equipment received and took possession of almost all of KBA's valuable equipment, and KBA assigned its valuable third-party contracts to Anvil Power.

12. KBA fully performed but Anvil Power and Anvil Equipment did not. They failed to purchase the KBA equipment. They used the equipment but suggested they had to keep the equipment off their books and proposed leasing some of the equipment from KBA.

13. KBA was willing to accommodate Defendants but did not agree to modify the Agreement.

14. Nonetheless, Defendants continued to possess and to use KBA equipment for almost two years without purchasing the equipment or making lease payments to KBA for their use of the equipment.

15. For certain equipment, Defendants did make minimum finance payments (to keep the equipment from being re-possessed) but again failed to purchase KBA's equity in the equipment or to pay KBA to use such equipment.

16. Plaintiffs have now learned that Defendants have added financing charges paid on KBA's behalf to the balance Anvil Builders claims is due from KBA on the above-referenced LOC.

17. Thus, in addition to just over a $1 Million in payroll expenses, Anvil Builders claims it is owed over $4 Million for equipment financing charges it has paid on KBA's behalf subsequent to Defendants' execution of the Agreement to purchase KBA's equipment or proposal to make lease payments.

18. In addition to failing to pay for KBA's equipment, Anvil Power and Anvil Equipment have also fired all of the KBA employees employed by Defendants on the assigned contracts (including the Kingsboroughs).

19. Defendants have also failed to make the PTO payments as agreed to under the Agreement.

20. Plaintiffs recently learned that on or about May 30, 2023, "Richard J. Leider, Anvil Builders, dba Atlas Tree Surgery") submitted a UCC-1 Financing Statement to the California Secretary of State, asserting by Anvil Builders a security interests in KBA's equipment as collateral pursuant to the June 5, 2023, LOC (the very equipment Defendants agreed to buy from KBA in the June 5, 2023, Agreement).

21. Plaintiffs also recently learned that on or about July 26, 2023, Anvil Builders submitted a UCC Financing Statement Amendment (UCC 3) to the California Secretary of State, releasing seven pieces of heavy equipment:

- Caterpillar 308E,
- Caterpillar 308E,
- Caterpillar 325,
- Caterpillar 950H,
- Sennebogen 718E,
- Sennebogen 718E, and a
- Caterpillar 518C.

22. On information and belief, Defendants have either sold the above pieces of equipment or have caused title to be transferred to Defendants by paying off the lender without paying KBA for its equity in such equipment, despite having agreed to buy the same from KBA in the June 5, 2023, Agreement.

23. Finally, and worst of all, despite taking in millions of dollars in revenue on the third-party contracts assigned by KBA, Defendants have failed to make any payments to KBA per the Agreement and have failed and refused to account for the income received from the assigned contracts.

24. Contrary to the spirit of the Agreement, the terms and conditions of the Agreement and the inducements given to KBA, Defendants have taken over KBA's business, its assets, its valuable contracts with third parties, its valuable intellectual property (while

Case: 25-01008   Doc# 1   Filed: 05/21/25   Entered: 05/21/25 12:04:34   Page 32 of 85

CARLE, MACKIE, POWER & ROSS LLP

announcing that KBA is out of business), without paying for such assets, and without performing their obligations under the Agreement, all the while charging KBA for millions of dollars' worth of financing expenses on equipment that the Defendants have had in their possession and have used and in some cases elected to purchase without paying KBA anything for its equity.

25. Clearly, Defendants' intent, rather than performing its obligations under the Agreement, was to circumvent the Agreement and acquire KBA's business for the lowest amount possible other than the cost of assuming certain liabilities necessary to satisfy equipment leasing companies and obtain title by paying only the amount financed (or negotiating a reduction of such amount).

26. As a result of Defendants' wrongful actions, Defendants have truly caused economic ruin for KBA, its work force and its owners, the Kingsboroughs.

27. Defendants have caused Plaintiffs to sustain significant financial harm and ongoing damages. By this action, Plaintiffs seek to hold Defendants accountable for their wrongdoing and will ask for an award of damages against Defendants in excess of $60 Million.

## THE PARTIES

28. Plaintiff, KINGSBOROUGH ATLAS TREE SURGERY, INC., is a California corporation, doing business in Sonoma County, California ("KBA").

29. Plaintiff, RICHARD KINGSBOROUGH ("Richard Kingsborough"), is an individual residing in Sonoma County, California.

30. Plaintiff, CINDY KINGSBOROUGH ("Cindy Kingsborough"), is an individual residing in Sonoma County, California.

31. Defendant, ANVIL POWER, INC., is a California corporation ("Anvil Power"). Defendant, ANVIL EQUIPMENT COMPANY LP, is a California limited partnership, ("Anvil Equipment").

32. ANVIL BUILDERS, INC., is a California corporation, ("Anvil Builders").

33. Defendant, ANVIL HOLDINGS, INC., is a California corporation, ("Anvil Holding").

34. Defendant, ANVIL GROUP, LLC, is a California limited liability company, and

CARLE, MACKIE,
POWER & ROSS LLP

5

Case: 25-01008   Doc# 1   Filed: 05/21/25   Entered: 05/21/25 12:04:34   Page 33 of 85
FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

general partner of Anvil Equipment ("Anvil Group").

35. Anvil Power, Anvil Equipment, Anvil Builders, Anvil Holdings, Anvil Group and all subsidiary and related entities are herein collectively referred to as "Anvil" or the "Anvil Entities."

36. Defendant, ALAN GUY, is a California resident, and is Chief Executive Officer of Anvil Power, Anvil Builders, Anvil Holdings, and a managing member of Anvil Group.

37. Defendant, RICHARD J. LEIDER ("Richard Leider"), is a California resident, and is Secretary of Anvil Builders, and on information and belief, an officer of Anvil Group.

38. The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants Does 1 through 100, inclusive, are unknown to Plaintiffs at the present time. Plaintiffs therefore sue said Defendants by such fictitious names and will seek leave of Court to amend this Complaint to set forth their true names and capacities thereof, when the same has been ascertained.

39. Defendants, and each of them, were and are the agents, servants, representatives, and/or employees of each of the other Defendants herein and were at all times acting within the course and scope of such agency, representation and employment, and with the permission and consent of each of said Defendants.

40. Plaintiffs are informed and believe, and upon such information and belief allege, that each of the Defendants, including Does 1 through 100, inclusive, were, at all times herein mentioned, acting in concert with, and/or in conspiracy with, each and every one of the remaining Defendants.

41. Wherever appearing in this Complaint, each and every reference to Defendants and to any of them, is intended to be and shall be a reference to all Defendants hereto, and to each of them, named and unnamed, including all fictitiously named Defendants, unless said reference is otherwise specifically qualified.

## JURISDICTION AND VENUE

42. Jurisdiction is proper in the State of California because the events giving rise to each and every single cause of action set forth herein occurred within the State of California.

Additionally, the agreement at issue in this dispute was drafted and executed in the State of California, and performance on such agreement occurred or was supposed to occur in the County of Sonoma, State of California. Defendants have sufficient contacts within the State of California such that they are subject to the jurisdiction of this state.

43. Venue in Sonoma County is proper because the agreement that is the subject of this Complaint was entered into and performed (or should have been performed) in the County of Sonoma, State of California.

**GENERAL ALLEGATIONS**

44. On June 5, 2023, KBA and the Kingsboroughs entered the Agreement, a written agreement, entitled Asset Purchase Agreement, with Anvil Power and Anvil Equipment.

45. In the Agreement, KBA and the Kingsboroughs agreed to sell all of KBA's and the Kingsboroughs' right, title, and interest in tangible and intangible assets, properties, and rights belonging to KBA and the Kingsboroughs, and Anvil Power agreed to purchase such assets (described in the Agreement as the "Anvil Power Purchased Assets"). A true and correct copy of the Agreement is attached hereto as **Exhibit A**.

46. The Anvil Power Purchased Assets are defined in the Agreement as follows: (i) assignable agreements between KBA and third-party entities, including such entities as Pacific Gas & Electric Co. ("PG&E"), all of whom KBA developed business relationships with over many years of doing business in Northern California. The agreements with third-party entities, who did business with KBA assigned to Anvil are referred to herein as the "Assigned Contracts"; (ii) all KBA related tradenames, trademarks, websites and business telephone numbers ("Intellectual Property"); (iii) all goodwill and going concern value; (iv) insurance policies (including, but not limited to, general liability, equipment and vehicle insurance, and workers' compensation), including those policies that are designated by Anvil Power, in writing, if any, that satisfy requirements of Assigned Contracts, e.g., PG&E's requirements (referred to in the Agreement as the "Assigned Insurance Policies"), or that satisfy requirements for ownership and use of Anvil Power Purchased Assets; and (v) all small tools etc. (e.g., chainsaws, safety gear, etc.).

CARLE, MACKIE,
POWER & ROSS LLP

7

Case: 25-01008   Doc# 1   Filed: 05/21/25   Entered: 05/21/25 12:04:34   Page 35 of 85
FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

47.     Anvil Power also agreed to assume certain liabilities of KBA (referred to as the "Anvil Power Assumed Liabilities"), which include all liabilities related to the Assigned Contracts, the Assigned Insurance Policies as well as accrued Paid Time Off (PTO) and vacation liabilities with respect to KBA employees hired by Anvil.

48.     In consideration for the foregoing sale and purchase of assets by Anvil Power, in addition to assuming certain liabilities, Anvil Power agreed to pay KBA $690,000, and a percentage of Anvil's net profit from the Assigned Contracts over a five-year period.

49.     Net profits are defined in the Agreement and include equipment charges for equipment used in connection with Assigned Contracts, to be charged to jobs at Anvil Power's internal rates which Anvil has represented to be lower than market rates. Under the Agreement, Anvil's net profits on the Assigned Contracts are to be determined in accordance with generally accepted accounting principles by an independent certified public accountant.

50.     Within one hundred twenty (120) days after the end of each year under the Agreement, Anvil Power is required to deliver to KBA a calculation of net profits from the Assigned Contracts, together with payment as required under the Agreement, and with regard to which KBA shall have the right, after not less than ten (10) business days' prior notice, to inspect books and records and all other documents and material, in whatever form, that are in the possession of or under the control of Anvil and its related entity, Anvil Builders and any other affiliates of Anvil necessary to calculate Anvil's net profits on the Assigned Contracts.

51.     In the Agreement, KBA and the Kingsboroughs also agreed to sell all of KBA and the Kingsboroughs' rights, title, and interests in, machinery, tools, vehicles (excluding personal vehicles), office equipment, and other tangible personal property, wherever located, designated by written notice from Anvil Equipment, and to deliver, assign, and transfer such property to Anvil Equipment.  Such property is collectively referred to as the "Anvil Equipment Purchased Assets."

52.     The aggregate purchase price for the Anvil Equipment Purchased Assets (the "Anvil Equipment Purchase Price") is defined in the Agreement as "determined by Buyers and Seller after reviewing the Ritchie Brothers Auctioneers valuation and the FLV values set forth in

CARLE, MACKIE,
POWER & ROSS LLP

8

Case: 25-01008    Doc# 1    Filed: 05/21/25    Entered: 05/21/25 12:04:34    Page 36 of 85
FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

the California Bank of Commerce valuation, provided that the Anvil Equipment Purchase Price shall not exceed Thirty Million dollars $30,000,000."

53. Pursuant to the Agreement, within days of June 5, 2023, KBA assigned over to Anvil Power and relinquished control over the Assigned Contracts, Intellectual Property, including trademarks, trade secrets, website, email and telephone numbers (hereinafter after "IP"), and has otherwise been cooperating with Anvil in every regard required by the Agreement.

54. Pursuant to the Agreement, Anvil Equipment identified and selected KBA equipment and KBA made such equipment available for Anvil's use and delivered the same over to Anvil. Pursuant to the Agreement, Anvil has taken possession of tens of millions of dollars' worth of heavy equipment and has been using such equipment or has possession of such equipment since such time.[1]

55. As a result of KBA's performance under the Agreement, since June 5, 2023, Anvil has enjoyed all of the benefits of the Agreement and in particular has received revenue, on information and belief, from the Assigned Contracts in excess of $80 Million in 2023 and in excess of $100 Million in 2024.[2]

56. However, for its part, Anvil has failed and refused to perform under the Agreement and has denied KBA from enjoying the primary benefits under the Agreement, including completion of the purchase of KBA's equipment and payment of a percentage Anvil's net profits generated from the several Assigned Contracts. These benefits promised by Anvil were and are the primary inducement for KBA to enter into the Agreement with Anvil.

57. In addition to the foregoing breaches by Anvil, despite having access to KBA's equipment and the benefit of the Assigned Contracts, Anvil has unreasonably delayed the closing as set forth in the Agreement. Despite a draft closing memorandum which identified equipment

---

1. Since the filing of this Action, in April 2025, after demands and after a motion was filed in Bankruptcy Court for a return of equipment, much of the above-described equipment has now been returned to KBA.

2. Since the filing of this Action, in April 2025, after demands and after a motion was filed in Bankruptcy Court for a return of equipment, much of the above described equipment has now been returned to KBA.

CARLE, MACKIE, POWER & ROSS LLP

9

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

to be sold to Anvil (including many items of equipment currently in use by Anvil or in its possession) and the short window to close, formal closing has yet to occur.

58. Further, rather than purchasing KBA equipment as required by the Agreement, Anvil has sought to change the deal and lease some equipment from KBA. Defendants have also unreasonably sought to pay less than market lease rate for such equipment. The reason given by Anvil for this practice is that it cannot make a profit leasing the equipment at market rates, and they say that they need to keep certain equipment assets off its books.

59. Anvil's attempt to recharacterize its use of equipment as leased equipment is in bad faith and a breach of the Agreement. Nonetheless, KBA has attempted to work with Anvil and as an accommodation to Anvil has expressed a willingness to accept rent but has not agreed to modify the Agreement and has not agreed on below market lease rates.

60. Despite KBA's accommodation, Anvil has failed and refused to pay rent to KBA on equipment in its possession and has stopped making lease payments or has never made lease payments on equipment, most of which Anvil continued to use or possess until April 2025.

61. The fair rental value for equipment that Anvil proposed to lease and which Anvil maintained in its possession until April 2025, or that it continues to use or maintains in its possession custody and control, exceeds $21 Million.

62. KBA is now informed and believes that even though Anvil sought to lease certain equipment from KBA, it is still expensing the same equipment internally at an inflated rate. Anvil has used equipment on Assigned Contract projects without having first paid for it, and then expensing it on its books at an inflated amount thereby reducing its profit on the Assigned Contract to KBA's financial detriment. This is a fraudulent scheme designed to reduce its profits on Assigned Contracts.

63. Further, with respect to other equipment for which KBA was still making finance payments, Anvil assumed some of those payments but failed to pay KBA for its equity in such equipment.

64. Worse, Anvil has treated certain finance payments paid on equipment in its possession as loans to KBA. Anvil has wrongfully added such amounts to the LOC, thereby

wrongfully increasing the amount of KBA's debt to Anvil.

65.     Plaintiffs have learned after the fact that Defendants filed a UCC-1 financing statement dated May 30, 2023, before the Agreement or the LOC were executed, that provided Defendants security interests in the property and equipment Defendants agreed to purchase from KBA in the Agreement.

66.     Plaintiffs have also learned after the fact, that Defendants filed a UCC 3 Amendment on or about July 26, 2025, showing seven pieces of equipment released so the same could be sold.

67.     In addition to the foregoing, Anvil has also failed to pay KBA for equipment it has taken possession of pursuant to the Agreement.

68.     For example, on at least one occasion, Anvil applied for and received $79,000 in insurance benefits (replacement costs) for a vehicle totaled in an accident. The vehicle, however, was never paid for by Anvil and is still registered to KBA and, thus, the insurance proceeds belong to KBA.

69.     Also, Anvil destroyed an expensive item of equipment known as a tub grinder that it had not yet purchased from KBA worth $1.4 Million. Anvil underinsured it and has not adequately compensated KBA for this destroyed equipment.

70.     Lastly, on information and belief, Anvil has ceased making financing payments on certain equipment in its possession (in connection with its purchase of said equipment) and has, thus, caused KBA financial harm as result of some equipment being repossessed.

71.     Anvil's treatment of KBA equipment as either leased property or purchased property, depending on what best suits its financial needs, is a breach of the Agreement and has resulted in significant damages to KBA.

72.     Anvil has also caused KBA to sustain significant financial damages by its failure to account and to pay KBA its share of net profits received by Anvil as a result of the PG&E contract and other Assigned Contracts.

73.     In particular, Anvil has greatly benefited from KBA's assignment of the PG&E contract. By its own admission, KBA is informed and believes that Anvil has received in excess

of $67 Million in 2023, and $87 Million in 2024, as a result of the PG&E contract without any accounting to KBA.

74.     KBA is informed and believes that Anvil set up another subsidiary, known as GASS, to operate a traffic control entity to manage traffic related expenses. KBA is informed and believes that in the first 18 months of the Agreement, Anvil has billed and received from PG&E in excess of $10 Million in revenue related to such expenses with very little by way of overhead.

75.     Despite clear language in the Agreement, Anvil has not accounted to KBA for any of this revenue (from the PG&E contract or any of the Assigned Contracts), and has not paid KBA anything as a result of the Assigned Contracts.

76.     Anvil's failure to perform and its attempts at revising the nature of the Agreement is symptomatic of Anvil's approach to its obligations under the Agreement and the manner in which Anvil describes its relationship with KBA. For example, the Agreement is plainly an asset purchase agreement. As described above, Anvil has attempted to refashion the Agreement into one in which Anvil can pick and choose between leasing or purchasing.

77.     For reasons that only Anvil understands, Anvil has on multiple occasions referred to its arrangement with KBA as a merger of two different business entities. Anvil went so far as to register fictious business name statements. For example, Anvil Builders doing business as Atlas Sonoma Tree.

78.     The representation by Anvil and Alan Guy that there is a merger or that Anvil is doing business as a KBA entity has been made to members of the public, to PG&E and to KBA's own employees (whom Anvil invited to join Anvil as employees).

79.     In addition to making such representations and inviting KBA employees to join Anvil, Anvil represented to PG&E that it would maintain Rich Kingsborough as a member of the Anvil management and maintain the KBA Training Program as part of Anvil's business model in the utility space.

80.     Despite representing to KBA that it would hire KBA employees, Rich Kingsborough and Cindy Kingsborough, Anvil did so only for a short window for appearances

sake only and quickly terminated the KBA employees it hired and systematically removed the Kingsboroughs from Anvil employment.

81.  Anvil used the perception of KBA's employees continuing with Anvil, including Rich and Cindy Kingsborough's participation, solely for its benefit in bad faith and quickly discarded them when it was no longer necessary to keep up the appearance that it had taken on KBA employees.

82.  Also, and even more glaring, despite agreeing to pay certain PTO obligations to KBA employees, after Anvil eliminated KBA personnel that had previously been offered jobs and replaced KBA managers with Anvil employees, Anvil failed to pay the PTO obligations for KBA employees as agreed.

83.  As a result of Anvil's pretense of hiring KBA employees and using KBA's name only to quickly terminate KBA employees, Anvil has harmed KBA's reputation in the business community.

84.  Plaintiffs are informed and believe that Anvil has failed to respond and to follow up with clients, some of whom had open projects, while doing business as Atlas Tree Surgery and Atlas Sonoma Tree (names associated with KBA). Anvil has also represented to the public that KBA has gone out of business. The Anvil Defendants' conduct and representations have caused significant harm to KBA's reputation in the business community.

85.  Moreover, Defendants have saddled KBA with fraudulent and mounting debt under the LOC created by Anvil and managed by Anvil Builders, doing business as Atlas Tree Surgery.

86.  In addition to payroll expenses owed by KBA at the outset of the Parties' relationship (as agreed upon by the Parties), Anvil has also added financing charges paid to lenders on equipment in Anvil's possession to KBA's LOC balance causing KBA's debt to Anvil to greatly exceed the approximate $1 Million advanced by Defendants for payroll expenses.

87.  As a result of Anvil's actions in adding financing charges to the LOC, Defendants assert KBA is now in debt to Anvil in an amount that exceeds $4 Million.

88.  Lastly, Anvil also obtained from the principals of KBA executed deeds of trust

dated June 2023 that secured the LOC with properties owned by the principals of KBA. These deeds of trust, like the UCC-1, were on information and belief, prepared by and provided to KBA and its principals by Richar Leider, who falsely representing that such instrument was necessary to implement the Agreement. They also referenced Anvil doing business as Atlas Tree Surgery.

89. Anvil did not fully disclose its intentions with the deeds of trust it sought from KBA's principals and, thus, the request to execute deeds of trust was done under false pretenses. Anvil did not inform KBA and the Kingsboroughs that Anvil would add to the LOC's principal balance amounts paid by Anvil to third-party finance companies for debt on the equipment.

90. Rather than making payments to KBA as required by the Agreement to purchase equipment, Anvil has increased the balance outstanding on its LOC by attributing finance payments made by Anvil as a loan to KBA.

91. On or about January 9, 2025, KBA made a demand on Anvil to account for its income and profit from Assigned Contracts, to produce its books and records as required by the Agreement, to complete the purchase of KBA equipment pursuant to the Agreement or return such equipment to KBA, and to make past due lease payments on equipment Anvil did not purchase but kept in its possession and used, in an amount in excess of $21 Million.

92. Anvil has refused all of Plaintiffs' demands for compensation.

93. In fact rather that complying with its obligations to account and to produce its books and records or its obligations to pay for the equipment in its possession and which it continues to use on projects under the Assigned Contracts, Anvil has doubled down, making false allegations of frauds and wrongdoing against the Kingsboroughs and their family and the family of other KBA managers in a transparent effort to harass and intimate the Kingsboroughs directly, even though Anvil and Alan Guy and Richard Leider know the Kingsboroughs are represented to by counsel.

### FIRST CAUSE OF ACTION

### (Breach of Contract – Anvil Power and Anvil Equipment)

94. Plaintiffs re-allege and incorporate into this cause of action each and every factual

CARLE, MACKIE,
POWER & ROSS LLP

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

allegation within the prior paragraphs, as if the same were fully set forth herein.

95.     The Agreement requires Anvil to pay KBA for the equipment it designates, uses and maintains in is possession. The Agreement requires Anvil to pay KBA a percentage of net profits generated by the Assigned Contracts and to account to KBA for such profits.

96.     Moreover, under the Agreement, the Kingsboroughs have the right, after not less than ten (10) business days' prior notice, to inspect books and records and all other documents and material, in whatever form, that are in the possession of or under the control of Anvil and its related entity, Anvil Builders and any other affiliates of Anvil necessary to calculate Anvil's net profits on the Assigned Contracts.

97.     Under the Agreement if such an inspection reveals an underpayment, Anvil is required to immediately repay KBA and the Kingsboroughs the amount of any underpayment discovered, plus interest, at an annual rate of ten percent (10%) prorated by the number of days from the original payment date to the repayment date.

98.     KBA has demanded that Anvil perform and purchase KBA's equipment, pay KBA its share of net profits on Assigned Contracts, and account and produce its books and records as required by the Agreement.

99.     KBA has requested Anvil produce its books and records or make the same available to KBA.

100.    Anvil has breached the Agreement by failing and refusing to pay for KBA's equipment (by keeping certain equipment and property and proposing to lease the same and by failing and refusing to make lease payments to KBA), by failing to pay any amount of its net profits to KBA on the Assigned Contracts, and by failing and refusing to account for its net profits under the Assigned Contracts.  Finally, Anvil is secreting equipment owned by KBA and removing it to an undisclosed location to the detriment and damage of Plaintiffs.

101.    To date, Plaintiffs have fully performed all conditions, covenants, and promises to be performed by them under the Agreement, except those that have been excused.

102.    Accordingly, Defendants have materially breached the Agreement.  As a proximate result of the breach of the Agreement by Defendants, as herein alleged, Plaintiffs have

CARLE, MACKIE,
POWER & ROSS LLP

15

Case: 25-01008    Doc# 1    Filed: 05/21/25    Entered: 05/21/25 12:04:34    Page 43 of 85
FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

been damaged in an amount to be proven at time of trial, which sum is in excess of the jurisdictional amount of this Court.

### SECOND CAUSE OF ACTION

**(Breach of Implied Covenant of Good Faith and Fair Dealing –**

**Anvil Power and Anvil Equipment)**

103. Plaintiffs re-allege and incorporate into this cause of action each and every factual allegation within the prior paragraphs, as if the same were fully set forth herein.

104. Defendants entered into the Agreement, a valid and enforceable contract.

105. To date, the Plaintiffs have fully performed all conditions, covenants, and promises to be performed under the Agreement, except those that have been excused. And all conditions required for Defendants' performance occurred: namely, that Plaintiffs delivered equipment to Defendants who in turn used such equipment for the work on the Assigned Contracts. Plaintiffs have also assigned the Assigned Contracts to Defendants per the Agreement. Defendants have commenced work on such Assigned Contracts and received revenue on such projects. Therefore, Defendants are required to perform pursuant to the Agreement and pay Plaintiffs accordingly.

106. Defendants' refusal to comply with the Agreement has prevented Plaintiffs from receiving the benefits of the Agreement. Defendants' actions and omissions and failures to perform given the circumstances as described hereinabove are unfair and in bad faith.

107. As a proximate result of Defendants' bad faith conduct, as herein alleged, Plaintiffs have been damaged in an amount to be proven at time of trial, which sum is in excess of the jurisdictional amount of this Court.

### THIRD CAUSE OF ACTION

**(Unfair Competition – Anvil Defendants)**

108. Plaintiffs re-allege and incorporate into this cause of action each and every factual allegation within the prior paragraphs, as if the same were fully set forth herein.

109. Defendants' aforesaid conduct constitutes unfair, unlawful, and fraudulent

business practices in violation of California Business & Professions Code Sections 17200.

110. Anvil's use of Plaintiffs' assets, equipment, IP (including business name) and millions of dollars' worth of contracts, without paying for such property and rights to build its business and to ruin Plaintiffs' business and reputation as described herein, is unlawful and fraudulent and constitutes unfair competition.

111. As a direct and proximate result of the fraudulent, unfair and illegal conduct and misappropriation of Plaintiffs' property and rights by Defendants and fraudulent imposition of debt on Plaintiffs as herein alleged, Plaintiffs have been damaged in an amount not yet ascertained and continue to be damaged.

112. These wrongful acts as described herein have proximately caused and/or will continue to cause Plaintiffs substantial injury, wrongful association, harm to their reputation, dilution of their goodwill, and diminution in value of its trade name and unjust enrichment. These actions cause imminent irreparable harm and injury to Plaintiffs.

113. As a result of Defendants' wrongful conduct, Plaintiffs are entitled to recover from Defendants the gains, profits, and advantages Defendants have obtained as a result of such wrongful acts as hereinabove alleged and said amounts should be disgorged and restitution made to Plaintiffs.

## FOURTH CAUSE OF ACTION

### (Conversion – Anvil Defendants)

114. Plaintiffs re-allege and incorporate into this cause of action each and every factual allegation within the prior paragraphs, as if the same were fully set forth herein.

115. By taking possession of millions of dollars' worth of equipment and property, including Plaintiffs' intellectual property, such emails, telephone numbers, website, and other trade secrets, which belong to Plaintiffs without paying for such property as described herein above, after Plaintiffs' demands on Defendants to pay for or return such equipment and property, Defendants have engaged in conversion.

116. By engaging in the conduct described herein above, Defendants have substantially interfered with Plaintiffs' property rights by knowingly or intentionally refusing to return the

CARLE, MACKIE,
POWER & ROSS LLP

17

Case: 25-01008   Doc# 1   Filed: 05/21/25   Entered: 05/21/25 12:04:34   Page 45 of 85
FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

equipment, vehicles and other property, including intellectual property, and rights after Plaintiffs made demand on Defendants to return such property and rights after Defendants failed and have refused to pay Plaintiffs for such property and rights.

117.    Plaintiffs did not consent to Defendants' conduct as described herein, and this conduct was a substantial factor in Plaintiffs' harm.

118.    As a result of the Defendants' conversion, Plaintiffs have been damaged in an amount to be determined at trial.

119.    Defendants' knowing and intentional misrepresentations of the facts was oppressive, fraudulent, and malicious.  Pursuant to California Civil Code, section 3294, Plaintiffs are entitled to an award of exemplary/punitive damages from Defendants in an amount appropriate to punish Defendants for this conduct.

## FIFTH CAUSE OF ACTION

**(Intentional Misrepresentation – Fraud – Anvil Power, Anvil Equipment, Alan Guy)**

120.    Plaintiffs re-allege and incorporate into this cause of action each and every factual allegation within the prior paragraphs, as if the same were fully set forth herein.

121.    In negotiating the Agreement and describing the Agreement and the intent of the Agreement after execution, Defendants, including Alan Guy, represented that: (a) Anvil would and intended to hire Plaintiff KBA's work force, including members of the Kingsborough family; (b) that Anvil would pay such employees PTO obligations of Plaintiff KBA; (c) that the Agreement was a merger between two parties; and (d) that Defendants relied on KBA's reputation and standing in the community to perform on the Assigned Contracts.

122.    In negotiating the Agreement and describing the Agreement and the intent of the Agreement after execution, Defendants, including Alan Guy, represented that Anvil would pay certain employment expenses incurred by KBA in advance of the Agreement, and that it would account for such expenses as a loan to KBA (described as a line of credit). Defendants requested and further represented that the Kingsboroughs' deeds of trusts would be used to secure such payments made by Anvil on KBA's behalf.

123.    On information and belief Richard Leider has been the main actor with regard to

CARLE, MACKIE,
POWER & ROSS LLP

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

the LOC. Richard Leider and Alan Guy misrepresented the purpose of the security agreement and UCC-1 and, in fact, filed a UCC-1 against KBA before there was an agreement to do so. They did not explain and obfuscated the security interest in that KBA and its principals did not understand that KBA was giving Anvil rights to foreclose and seize the equipment Anvil had agreed to purchase. They did not approve the UCC-1 filed in May 2025.

124. The foregoing representations by Defendants, Alan Guy and Richard Leider, were false when they made them, and the Defendants, Alan Guy and Richard Leider, knew that the representations were false and/or the Defendants made such representations recklessly and without regard for their truth. The Defendants and Alan Guy and Richard Leider never intended to perform according to the terms of the Agreement, and especially their promises regarding employment of KBA employees, including members of Kingsborough family, were made by Alan Guy to induce Plaintiffs to enter into the Agreement with Defendants.

125. The Defendants made the representations with the intention that the Plaintiffs would rely on them. Namely, the Defendants made the representations to induce the Plaintiffs to enter into the Agreement and assign the Assigned Contracts and to deliver Plaintiffs' equipment and vehicles, and IP to Defendants.

126. The Defendants made the forgoing representations to induce the Plaintiffs to enter into the Agreement.

127. The Plaintiffs reasonably relied on the Defendants' representations in executing and performing pursuant to the Agreement.

128. Accordingly, as a result of the false representations as described herein, the Plaintiffs have been damaged in an amount to be proven at the time of trial, which sum is in excess of the jurisdictional amount of this Court.

129. The Plaintiffs' reliance on the Defendants' representations was a substantial factor in causing their harm.

130. Defendants' knowing and intentional misrepresentations of the facts was oppressive, fraudulent, and malicious. Pursuant to California Civil Code, section 3294, Plaintiffs are entitled to an award of exemplary/punitive damages from Defendants in an amount

appropriate to punish Defendants for this conduct.

## SIXTH CAUSE OF ACTION

### (Negligent Misrepresentation – Anvil Power, Anvil Equipment, Alan Guy)

131.     Plaintiffs re-allege and incorporate into this cause of action each and every factual allegation within the prior paragraphs, as if the same were fully set forth herein.

132.     In negotiating the Agreement and describing the Agreement and the intent of the Agreement after execution, Defendants, including Alan Guy, represented that: (a) Anvil would and intended to hire Plaintiff KBA's work force including members of the Kingsborough family; (b) that Anvil would pay such employees PTO obligations of Plaintiff KBA; (c) that the Agreement was a merger between two parties; and (d) that Defendants relied on the KBA's reputation and standing in the community to perform on the Assigned Contracts.

133.     In negotiating the Agreement and describing the Agreement and the intent of the Agreement after execution, Defendants, including Alan Guy, represented that Anvil would pay certain employment expenses incurred by KBA in advance of the Agreement, and that they would account for such expenses as a loan to KBA (described as a line of credit). Defendants requested and further represented that the Kingsboroughs' deeds of trusts would be used to secure such payments made by Anvil on KBA's behalf.

134.     The representations by Defendants and Alan Guy were false when they made them, and the Defendants and Alan Guy knew that the representations were false and/or the Defendants or Alan Guy made such representations recklessly and without regard for their truth. The Defendants and Alan Guy never intended to perform according to the terms of the Agreement and especially that promises regarding employment of KBA employees was made to induce Plaintiffs to enter into an agreement with Defendant.

135.     The Defendant made the representations with the intention that the Plaintiffs would rely on them. Namely, the Defendants and Alan Guy made the representations to induce the Plaintiffs to enter into the Agreement and assign the Assigned Contracts and to deliver Plaintiffs' equipment and vehicles to Defendants.

136.     The Defendants did so to induce the Plaintiffs to enter into the Agreement.

CARLE, MACKIE, POWER & ROSS LLP

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

137. The Plaintiffs reasonably relied on the Defendants' representations in executing and performing pursuant to the Agreement.

138. The Plaintiffs would not have entered into the Agreement if they had known that the representations were not true.

139. Accordingly, the Plaintiffs have been damaged in an amount to be proven at the time of trial, which sum is in excess of the jurisdictional amount of this Court.

140. The Plaintiffs' reliance on the Defendants' representations was a substantial factor in causing their harm.

## SEVENTH CAUSE OF ACTION

### (Conspiracy to Defraud – Alan Guy and Richard Leider)

141. Plaintiffs re-allege and incorporate into this cause of action each and every factual allegation within the prior paragraphs, as if the same were fully set forth herein.

142. Defendants' aforesaid conduct constitutes conspiracy to harm and defraud Plaintiffs. In particular the use of a LOC, UCC-1, and deeds of trust as discussed above constitute fraudulent activity engaged in to harm Plaintiffs.

143. These wrongful acts as described herein have proximately caused and/or will continue to cause Plaintiffs substantial injury, wrongful association, harm to their reputation, dilution of their goodwill, and diminution in value of its trade name and unjust enrichment. These actions cause imminent irreparable harm and injury to Plaintiffs.

144. As a result of Defendants' wrongful conduct, Plaintiffs are entitled to recover from Defendants the gains, profits, and advantages Defendants have obtained as a result of such wrongful acts as hereinabove alleged, and said amounts should be disgorged and restitution made to Plaintiffs.

## EIGHTH CAUSE OF ACTION

### (Accounting – Anvil Defendants)

145. Plaintiffs re-allege and incorporate by reference and incorporate into this cause of action each and every factual allegation within the prior paragraphs, as if the same were fully set forth herein.

CARLE, MACKIE,
POWER & ROSS LLP

Case: 25-01008    Doc# 1    Filed: 05/21/25    Entered: 05/21/25 12:04:34    Page 49 of 85

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

146. As noted above, Plaintiffs have made demand on Defendants to account for net profits earned under the Assigned Contracts as required under the Agreement, and Defendants have, to date, failed and refused to do so.

147. Plaintiffs seek an accounting as well as the location and condition of all equipment, vehicles and other property in Defendants' possession, custody and control.

148. Defendants should provide an accounting of all net profits earned from the Assigned Contracts to date, and the Court should enter an order awarding Plaintiff KBA its percentage share of such net profits pursuant to the Agreement.

## NINTH CAUSE OF ACTION

### (Declaratory Relief – Anvil Defendants)

149. Plaintiffs re-allege and incorporate into this cause of action each and every factual allegation within the prior paragraphs, as if the same were fully set forth herein.

150. An actual controversy has arisen and now exists between Plaintiffs and Defendants as alleged herein, concerning their respective rights and duties owed under the Agreement, including the obligation by Defendants to account to Plaintiffs for net profits associated with the Assigned Contracts, and Anvil's creation and use of a so-called LOC secured by deeds of trust and a UCC-1 Statement filed before the date of the alleged LOC.

151. Defendants' use of this so-called LOC is wrongful and fraudulent as Defendants have used it to saddle Plaintiffs with debt based on payments Defendants have made on finance accounts for vehicles and equipment belonging to Plaintiff KBA that Defendants have had in their possession and which Defendants are contractually obligated to purchase.

152. Defendants' conduct as herein described in connection with the so-called LOC, deeds of trust and UCC-1 have caused Plaintiffs significant financial injury.

153. Plaintiffs request a judicial determination declaring that the LOC allegedly created by Defendants, the deeds of trust Defendants obtained from the Kingsboroughs, and the UCC-1 filed in May 2024 (even before any alleged security agreement), to secure such debt are hereby null and void.

154. Defendants' conduct as herein described regarding Defendants' failure and refusal

CARLE, MACKIE,
POWER & ROSS LLP

to account for net profits associated with the Assigned Contracts has caused Plaintiffs significant financial injury.

155. Plaintiffs request a judicial determination declaring that Defendants must account for their net profits under the Agreement and pay Plaintiff KBA its percentage of such net profits as required under the Agreement.

156. A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiffs may ascertain their rights and Defendants' duties under the Agreement.

## TENTH CAUSE OF ACTION

### (Injunctive Relief – Anvil Defendants)

157. Plaintiffs re-allege and incorporate into this cause of action each and every factual allegation within the prior paragraphs, as if the same were fully set forth herein.

158. Defendants now threaten to sell equipment, property and valuable IP to undisclosed third parties that Defendants have failed to pay pursuant to the Agreement as a means of attempting to coerce and threaten Plaintiffs. This includes customer lists compiled by Plaintiff KBA that are not included in the assets sold and over which Defendants alleged ownership.

159. Plaintiffs are informed and believe, and on that basis allege, that unless Defendants are restrained and enjoined by an order from this Court from selling such property, equipment and IP or continuing to use it without paying for it, that Plaintiffs will continue to sustain significant and irreparable permanent financial injury.

160. Defendants have returned a significant amount of equipment as of April 2025. However, there are still some items of equipment and vehicles that have not been returned

161. The threat of such irreparable and permanent damage justifies the issuance by this Court of a permanent injunction expressly authorized by Code of Civil Procedure Section 526. Monetary relief may not adequately compensate Plaintiffs for harm that could otherwise be enjoined.

162. Plaintiffs have no adequate remedy at law for the injuries that Plaintiffs have

1  suffered and will continue to suffer in the future without injunctive relief.

2  163.  Plaintiffs are likely to prevail on the merits of the breach of contract claim, as

3  Defendants are clearly in breach of the Agreement.

4  164.  Plaintiffs thus request a court order preliminarily and permanently enjoining

5  Defendants, their agents, servants, and employees, and all persons acting under, in concert with,

6  or for them from possessing and utilizing equipment and property that Defendants have not paid

7  for that belong to Plaintiffs.

8  165.  Plaintiffs further request a court order preliminarily and permanently requiring

9  Defendants to take all action necessary, including securing, maintaining in good repair all

10  equipment and property belonging to Plaintiffs that have not been paid for by Defendants and to

11  return such equipment and property to Plaintiffs without delay.

12  166.  Plaintiffs further request a court order preliminarily and permanently enjoining

13  Defendants from interfering in any manner with Plaintiffs' rights to the property, including IP

14  and equipment referenced herein, including an order prohibiting the sale or transfer of Plaintiffs

15  property, equipment, or assets of any kind, including IP in Defendants' possession, custody or

16  control.

17  <u>**PRAYER FOR RELIEF**</u>

18  WHEREAS, based on the foregoing factual allegations and causes of action asserted

19  herein, Plaintiffs pray for the following relief against all Defendants, jointly and severally:

20  1.  For general, special, consequential, and compensatory damages in an amount to

21  be proven at trial;

22  2.  For punitive and exemplary damages in an amount to be proven at trial;

23  3.  For an Order providing temporary and permanent injunctive relief as follows:

24  a.  Requiring Defendants to take all action necessary, including accounting

25  for, securing, maintaining in good repair all property, equipment and

26  assets, including Intellectual Property belonging to Plaintiffs and to return

27  such property, equipment and other assets to Plaintiffs without delay;

28  b.  Prohibiting the sale or transfer by Defendants of property, equipment and

CARLE, MACKIE,
POWER & ROSS LLP

24

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

other assets of any kind in Defendants' possession, custody or control that belong to Plaintiffs;

4. For an accounting of the location and condition of equipment and other property in Defendants' possession, custody and control subject to the Agreement;

5. For an accounting of Defendants' profits in connection with the Assigned Contracts;

6. For a judicial determination declaring that the line of credit created by Defendants and deeds of trust Defendants demanded the Kingsboroughs provide to secure such debt are hereby null and void;

7. For an accounting by Defendants of their net profits under the Agreement with regard to the Assigned Contracts;

8. For rescission of the Agreement;

9. For an award of attorneys' fees and costs;

10. For pre-judgment interest as permitted by law; and

11. For such other relief as the Court deems just and proper.

Dated: May 13, 2025

CARLE, MACKIE, POWER & ROSS LLP

By: _____
Philip J. Terry
Kimberly Corcoran
Attorneys for Plaintiffs
KINGSBOROUGH ATLAS TREE
SURGERY, INC., RICHARD
KINGSBOROUGH, and
CINDY KINGSBOROUGH

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

# EXHIBIT A

DocuSign Envelope ID: 96DDC66D-5F1E-4EC9-895C-977A1AA40A6A

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of June 5, 2023, is entered into among KINGSBOROUGH ATLAS TREE SURGERY, INC., a California corporation ("**Seller**"), RICHARD KINGSBOROUGH and CINDY KINGSBOROUGH (collectively, "**Shareholders**" and each individually, a "**Shareholder**") and ANVIL POWER, INC., a California corporation ("**Anvil Power**") and ANVIL EQUIPMENT COMPANY LP, a California limited partnership ("**Anvil Equipment**"). Seller and Shareholders are sometimes referred to in this Agreement as "**Seller Parties**" and each individually as a "**Seller Party**". Anvil Power and Anvil Equipment are sometimes referred to in this Agreement collectively as "**Buyers**" and individually as "**Buyer**". This Agreement is entered into under the following circumstances:

## RECITALS

A.    Seller is engaged in the business of residential, commercial, and governmental tree service (the "**Business**"). Shareholders own all of the outstanding capital stock of Seller.

B.    Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, certain of the assets, and certain specified liabilities, of the Business, subject to the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01    Purchase and Sale of Assets.**

(a)    <u>Sale to Anvil Power</u>. Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, convey, assign, transfer, and deliver to Anvil Power, and Anvil Power shall purchase from Seller, all of Seller's right, title, and interest in, to, and under the tangible and intangible assets, properties, and rights described below, wherever located (collectively, the "**Anvil Power Purchased Assets**"):

(i)    All agreements with Pacific Gas & Electric Co. ("**PG&E**"), and other agreements with customers to the extent that they are assignable (the "**Assigned Contracts**");

(ii)    All tradenames, trademarks, websites and business telephone numbers;

(iii)    All goodwill and going concern value;

1

(iv)     Insurance policies (general liability with fire exclusion and others) that are designated by Anvil Power in writing, if any, that satisfy PG&E's requirements (the "**Assigned Insurance Policies**"); and

(b)     All  small tools etc. (chainsaws, safety gear, vests etc.).

(c)     <u>Sale to Anvil Equipment</u>.  Subject to the terms and conditions set forth herein, at the Closing initially, and after the Closing at any time designated by Anvil Equipment within thirty (30) days after the date of this Agreement, Seller shall sell, convey, assign, transfer, and deliver to Anvil Equipment, and Anvil Equipment shall purchase from Seller, all of Seller's right, title, and interest in, to, and machinery, tools, vehicles, excluding personal vehicles, office equipment, and other tangible personal property designated by written notice from Anvil Equipment to Seller, wherever located, together with all of Seller's rights under warranties, indemnities, and similar rights against third parties relating to any property described in this paragraph (collectively, the "**Anvil Equipment Purchased Assets**").

**Section 1.02    Assumed Liabilities.**

(a)     Subject to the terms and conditions set forth herein, Anvil Power shall assume and agree to pay, perform, and discharge only the following Liabilities of Seller (collectively, the "**Anvil Power Assumed Liabilities**"), and no other Liabilities:

(i)     all Liabilities in respect of the Assigned Contracts and the Assigned Insurance Policies, but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date, were incurred in the ordinary course of business, and do not relate to any failure to perform, improper performance, warranty, or other breach, default, or violation by Seller on or prior to the Closing; and

(ii)     Accrued Paid Time Off (PTO) and vacation liabilities with respect to Seller's employees who are hired by Buyer, up to an aggregate amount of $200,000 (the "**Accrued PTO Liability**").

For purposes of this Agreement, "**Liabilities**" means liabilities, obligations, or commitments of any nature whatsoever, whether asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured, or otherwise.

(b)     Notwithstanding any provision in this Agreement to the contrary, Buyers shall not assume and shall not be responsible to pay, perform, or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "**Excluded Liabilities**"). For purposes of this Agreement: (i) "**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person; and (ii) the term "**control**" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

2

DocuSign Envelope ID: 96DDC66D-5F1E-4EC9-895C-977A1AA40A6A

**Section 1.03    Purchase Price.**

(a)    The aggregate purchase price for the Anvil Power Purchased Assets (the "**Anvil Power Purchase Price**") shall be (i) $690,000 (the "**Anvil Power Fixed Component**"), (ii) the assumption of the Anvil Power Assumed Liabilities, and (iii) a percentage of the Net Profit from the Assigned Contracts during the five (5) Years (as defined below) after the Closing, determined as follows:

| Year | Profit Percentage |
|------|-------------------|
| 1 and 2 | 35% |
| 3 | 25% |
| 4 | 20% |
| 5 | 15% |

(b)    "**Net Profit**" shall equal revenue minus expenses.  Expenses shall include:

(i)    All job expenses directly related to the Assigned Contracts;

(ii)    All labor costs (direct and management), including all taxes, benefits, 401K contributions and costs, bonuses, and insurance premiums prorated for services provided under the Assigned Contracts;

(iii)    All equipment necessary for the Assigned Contracts, to be charged to jobs at Anvil Power's internal rates (lower than market rates); and

(iv)    Anvil Power's actual overhead of 4% to 9% for the applicable year.

For purposes of determining Net Profit, each "**Year**" shall begin on the first day of the calendar month on or after the Closing, and on the same day of each succeeding calendar year, and shall conclude on last day of the twelfth month immediately thereafter.  Net Profit shall be determined in accordance with generally accepted accounting principles by the independent accountants then servicing Anvil Power.

(c)    **Payment of Net Profit; Audit Right.**  Within one hundred twenty (120) days after the end of each Year, Anvil Power shall deliver to Seller a calculation of Net Profit, if any, or if there is no Net Profit, a calculation of Anvil Power's net loss from the Assigned Contracts (a "**Net Profit Statement**"), for the immediately preceding Year together with payment of the applicable Profit Percentage. Seller shall have the right, during Anvil Power's regular business hours after not less than ten (10) business days' prior notice, to inspect books and records and all other documents and material, in whatever form, that are in the possession of or under the control of Buyers, Anvil Builders Inc., a California corporation ("**Anvil Builders**"), and any of Buyers' or Anvil Builders' Affiliates with respect to the calculation of Net Profit, including but not limited

3

to all records relating to the job expenses, labor costs, equipment costs, and overhead, at the place or places where such records are normally retained by Buyers, Anvil Builders, or an Affiliate of Buyers or Anvil Builders, provided that Seller's inspection right with respect to the Net Profit reported on a Net Profit Statement shall terminate one year after the delivery to Seller of such Net Profit Statement. If such inspection reveals an underpayment of five percent (5%) or more of the amounts owed for the period being inspected or if the inspection results in a Net Profit of which Seller is entitled to a portion and no Profit Percentage was paid, Buyers shall reimburse Seller for its reasonable costs and expenses incurred in connection with such examination. Buyers shall immediately repay Seller the amount of any underpayment discovered plus interest at an annual rate of ten percent (10%) prorated by the number of days from the original payment date to the repayment date.

(i)     All books and records related to each Net Profit Statement shall be maintained and kept accessible and available to Seller for inspection for at least one (1) year after the date of delivery of the Net Profit Statement to Seller.

(ii)    If an investigation of Buyers', Anvil Builders', or Buyers' or Anvil Builders' Affiliate's books and records is made, certain confidential and proprietary business information of Buyers, Anvil Builders, or an Affiliate of Buyers or Anvil Builders may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be retained in confidence by Seller and shall not be used by Seller or disclosed to any third party without the prior express written permission of Seller, unless required by law. It is understood and agreed, however, that such information may be used in any proceeding based on Buyers' underpayment of an applicable Profit Percentage pursuant to this Agreement or refusal to pay an applicable Profit Percentage.

(d)     The aggregate purchase price for the Anvil Equipment Purchased Assets (the "**Anvil Equipment Purchase Price**") shall be the value of the Anvil Equipment Purchased Assets as determined by Buyers and Seller after reviewing the Ritchie Brothers Auctioneers valuation and the FLV values set forth in the California Bank of Commerce valuation, provided that the Anvil Equipment Purchase Price shall not exceed thirty million dollars $30,000,000.

**Section 1.04   Payment of Purchase Price.**

(a)     Anvil Power shall pay the Anvil Power Fixed Component, which shall be reduced by the Accrued PTO Liability, in cash at closing, or Anvil Builders may pay all or any portion of the Anvil Power Purchase Price on behalf of Anvil Power by setting off all or any portion of the Anvil Power Purchase Price against the amount then owing by Seller to Anvil Builders pursuant to the Line of Credit and Security Agreement dated the date of this Agreement between Anvil Builders and Seller (the "**Line of Credit Agreement**").

(b)     Anvil Equipment shall pay the Anvil Equipment Purchase Price in cash at closing, or Anvil Builders may pay all or any portion of the Anvil Equipment Purchase Price on behalf of Anvil Power by setting off all or any portion of the Anvil Equipment Purchase Price against the amount then owing by Seller to Anvil Builders pursuant to the Line of Credit

4

Agreement (reduced by any reduction in the balance owing pursuant to paragraph (a) immediately above.

        (c)     The cash portion of the purchase prices payable by Buyers shall be applied at the Closing in the following order and priority:

        (i)     First, to fully satisfy the amount owing to any secured lender on any item of equipment purchased by Anvil Equipment;

        (ii)     Second, to fully satisfy any payoff demand from California Bank of Commerce with respect to the assets that are acquired;

        (iii)     Third, to satisfy any claims or liens for taxes (other than taxes not yet due and payable); and

        (iv)     Fourth, to Seller.

**Section 1.05  Allocation of Purchase Price.** The Anvil Power Purchase Price and the Anvil Equipment Purchase Price (collectively, the "**Purchase Price**") and the Assumed Liabilities shall be allocated among the Anvil Power Purchased Assets and the Anvil Equipment Purchased Assets (collectively, the "**Purchased Assets**") for all purposes (including Tax and financial accounting) as shown on the allocation schedule to be agreed upon by the parties before the Closing and set forth on <u>Exhibit 1.05</u> (the "**Allocation Schedule**"). The Allocation Schedule shall be prepared in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended. Buyer and Seller shall file all returns, declarations, reports, information returns and statements, and other documents relating to Taxes (including amended returns and claims for refund) ("**Tax Returns**") in a manner consistent with the Allocation Schedule.

**Section 1.06  Existing Contracts**. <u>Exhibit 1.06</u> lists certain material contracts of Seller (the "**Specified Contracts**").   If, at the end of the contracted work under each Specified Contract, (i) actual costs incurred following the Closing for any Specified Contract exceeds total revenue received following Closing under such Specified Contract and (ii) the Assigned Contracts as a whole have not been profitable in the period from Closing, then Seller shall reimburse Buyer for the amount that actual costs exceed total revenue on any such Specified Contract.

**Section 1.07  Withholding Tax.** Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer may be required to deduct and withhold under any provision of Tax Law. All such withheld amounts shall be treated as delivered to Seller hereunder.

**Section 1.08  Third-Party Consents.** To the extent that Seller's rights under any Purchased Asset may not be assigned to Buyers without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall use its reasonable best efforts to obtain any such required consent(s) as promptly as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyers' rights under the Purchased Asset in question so that Buyers would not in

effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by Law and the Purchased Asset, shall act after the Closing as Buyers' agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the Purchased Asset, with Buyers in any other reasonable arrangement designed to provide such benefits to Buyers.

## ARTICLE II
## CLOSING

**Section 2.01 Closing.** Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Buyer or remotely by exchange of documents and signatures (or their electronic counterparts), (i) at 10:00 a.m. on July 3, 2023 or (ii) not less than not less than two days after the Conditions to Closing set forth in Article VI have been satisfied, whichever is later, or at such other time or place or in such other manner as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**."

**Section 2.02 Closing Deliverables.**

(a) At the Closing, Seller shall deliver to Buyer the following:

(i) a bill of sale (the "**Bill of Sale**") duly executed by Seller, transferring the Anvil Equipment Purchased Assets to Anvil Equipment;

(ii) an assignment and assumption agreement (the "**Assignment and Assumption Agreement**") and duly executed by Seller, effecting the assignment to and assumption by Anvil Power of the Anvil Power Purchased Assets and the Assumed Liabilities;

(iii) a certificate of the Secretary of Seller certifying as to (A) the resolutions of the board of directors and the shareholders of Seller, which authorize the execution, delivery, and performance of this Agreement, the Bill of Sale, the Assignment and Assumption Agreement, and the other agreements, instruments, and documents required to be delivered in connection with this Agreement or at the Closing (collectively, the "**Transaction Documents**") and the consummation of the transactions contemplated hereby and thereby, and (B) the names and signatures of the officers of Seller authorized to sign this Agreement and the other Transaction Documents; and

(iv) such other customary instruments of transfer or assumption, filings, or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to the transactions contemplated by this Agreement.

(b) At the Closing, Buyers shall deliver to Seller the following:

(i) the purchase prices payable by Buyers determined pursuant to Section 1.03 (subject to Section 1.04(c));

(ii)     the Assignment and Assumption Agreement duly executed by Anvil Power; and

(iii)     Certificates of the Secretary (or equivalent officer) of Buyers certifying as to (A) the resolutions of the boards of directors of Buyers, which authorize the execution, delivery, and performance of this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and (B) the names and signatures of the officers of Buyers authorized to sign this Agreement and the other Transaction Documents.

(c)     At the Closing, Richard Kingsborough and Anvil Power shall enter into an Employment Agreement having a five (5) year term, subject to early termination for cause.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER PARTIES

Seller Parties jointly and severally represent and warrant to Buyer that the statements contained in this ARTICLE III are true and correct as of the date hereof.

**Section 3.01  Organization and Authority of Seller.** Seller is a corporation duly organized, validly existing, and in good standing under the Laws of the State of California. Seller has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and any other Transaction Document to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder, and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate, board, and shareholder action on the part of Seller. This Agreement and the Transaction Documents constitute legal, valid, and binding obligations of Seller enforceable against Seller in accordance with their respective terms.  Shareholders own all of the issued and outstanding shares of capital stock of Seller, free and clear of any liens, encumbrances or options.

**Section 3.02  No Conflicts or Consents.** The execution, delivery, and performance by Seller Parties of this Agreement and the other Transaction Documents to which they are a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the certificate of incorporation, by-laws, or other governing documents of Seller; (b) violate or conflict with any provision of any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, other requirement, or rule of law of any Governmental Authority (collectively, "**Law**") or any order, writ, judgment, injunction, decree, stipulation, determination, penalty, or award entered by or with any Governmental Authority ("**Governmental Order**") applicable to Seller, the Business, or the Purchased Assets; (c) require the consent, notice, declaration, or filing with or other action by any individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity ("**Person**") or require any permit, license, or Governmental Order; (d) violate or conflict with, result in the acceleration of, or create

7

in any party the right to accelerate, terminate, modify, or cancel any Contract to which Seller is a party or by which Seller or the Business is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (e) result in the creation or imposition of any charge, claim, pledge, equitable interest, lien, security interest, restriction of any kind, or other encumbrance ("**Encumbrance**") on the Purchased Assets.

**Section 3.03  Undisclosed Liabilities.** Seller has no Liabilities with respect to the Business, except (a) those which are adequately reflected or reserved against in the Balance Sheet of Seller as of February 28, 2023 (the "**Balance Sheet Date**"), and (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and which are not, individually or in the aggregate, material in amount.

**Section 3.04  Assigned Contracts.** Each Assigned Contract is valid and binding on Seller in accordance with its terms and is in full force and effect. Neither Seller nor, to Seller's knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Assigned Contract. No event or circumstance has occurred that would constitute an event of default under any Assigned Contract or result in a termination thereof. Complete and correct copies of each Assigned Contract (including all modifications, amendments, and supplements thereto and waivers thereunder) have been made available to Buyer. There are no material disputes pending or threatened under any Assigned Contract.

**Section 3.05  Title to Purchased Assets.** Seller has good and valid title to all the Purchased Assets, free and clear of Encumbrances, other than (a) the security interest held by California Bank of Commerce, and (b) security interests held by lenders in specific items of equipment included in the Anvil Equipment Purchased Assets.

**Section 3.06  Condition of Assets.** Each item of the Anvil Equipment Purchased Assets is in good operating condition and repair, and is adequate for the uses to which it is being put, and no item of the Anvil Equipment Purchased Assets is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost."

**Section 3.07  Legal Proceedings; Governmental Orders.**

(a)  There are no claims, actions, causes of action, demands, lawsuits, arbitrations, inquiries, audits, notices of violation, proceedings, litigation, citations, summons, subpoenas, or investigations of any nature, whether at law or in equity (collectively, "**Actions**") pending or, to Seller's knowledge, threatened against or by Seller: (i) relating to or affecting the Business, the Purchased Assets, or the Assumed Liabilities; or (ii) that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

(b)  There are no outstanding Governmental Orders against, relating to, or affecting the Business or the Purchased Assets.

8

**Section 3.08   Compliance with Laws.** Seller is in compliance with all Laws applicable to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets.

**Section 3.09   Taxes.** All Taxes due and owing by Seller have been, or will be, timely paid. No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Seller. All Tax Returns required to be filed by Seller for any tax periods prior to Closing have been, or will be, timely filed. Such Tax Returns are, or will be, true, complete, and correct in all respects. The term "**Taxes**" means all federal, state, local, foreign, and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, withholding, payroll, employment, unemployment, excise, severance, stamp, occupation, premium, property (real or personal), customs, duties, or other taxes, fees, assessments, or charges of any kind whatsoever, together with any interest, additions, or penalties with respect thereto.

**Section 3.10   Brokers.** Except for Baserock Partners, no broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Seller.

**Section 3.11   Full Disclosure.** No representation or warranty by Seller in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this ARTICLE IV are true and correct as of the date hereof.

**Section 4.01   Organization and Authority of Buyer.** Buyer is a corporation duly organized, validly existing, and in good standing under the Laws of the State of California. Buyer has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement and the Transaction Documents constitute legal, valid, and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

9

**Section 4.02  No Conflicts; Consents.** The execution, delivery, and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the articles of incorporation, bylaws, or other organizational documents of Buyer; (b) violate or conflict with any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice, declaration, or filing with or other action by any Person or require any permit, license, or Governmental Order.

**Section 4.03  Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

**Section 4.04  Legal Proceedings.** There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 4.05  Buyer Investigation.** Buyer acknowledges and agrees that in no event shall Seller have any liability to Buyer with respect to the breach of any representation, warranty, or covenant in this Agreement to the extent Buyer knew of such breach as of the Closing or Closing Date.

**ARTICLE V**
**COVENANTS**

**Section 5.01  Confidentiality.** From and after the Closing, Seller Parties shall, and shall cause their Affiliates to, hold, and shall use their reasonable best efforts to cause their respective directors, officers, employees, consultants, counsel, accountants, and other agents ("**Representatives**") to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that Seller can show that such information: (a) is generally available to and known by the public through no fault of Seller, any of its Affiliates, or their respective Representatives; or (b) is lawfully acquired by Seller, any of its Affiliates, or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual, or fiduciary obligation. If Seller Parties or any of their Affiliates or their respective Representatives are compelled to disclose any information by Governmental Order or Law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which is legally required to be disclosed, *provided that* Seller shall use reasonable best efforts to obtain as promptly as possible an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**Section 5.02  Employees.**

DocuSign Envelope ID: 96DDC66D-5F1E-4EC9-895C-977A1AA40A6A

(a)     Upon the Closing, Anvil Power and/or an Affiliate of Anvil Power shall offer employment to substantially all of Seller's employees for substantially the same pay, benefits and positions.  Seller shall cooperate with Anvil Power's recruitment of Seller's employees.

(b)     After the Closing, neither Anvil Power nor any Affiliate shall terminate 50 or more employees or change their compensation, benefits (including retirement plans, health insurance, vacation and sick days), level of seniority, working conditions or job responsibilities within thirty (30) days after Closing.

**Section 5.03  Real Property.**  Effective as of the Closing, Anvil Power and Anvil Equipment shall sublease or license some of the real property occupied by Seller on a month-to-month basis at rates equal to the per square foot rental rates paid by Seller on properties not owned by Shareholders, and fair market value on properties owned by Shareholders (to be negotiated) for a period not to exceed ninety (90) days. Thereafter, Anvil Power and/or Anvil Equipment intend to lease or sublease certain real property presently occupied by Seller on a longer term basis after a review of their post-closing operations and anticipated needs; provided that neither Anvil Power nor Anvil Equipment shall be required to lease or sublease any such property after the ninety (90) day period after the Closing has elapsed.  The parties intend that for properties owned by Shareholders, the terms of such leases or subleases will be based on their current fair market value (to be negotiated) for a period of up to 5 years and include an option to renew such leases or subleases for a period of up to 5 years at their then fair market value or agreed upon escalation percentage.  During the ninety (90) day period after the Closing, Anvil Power shall have a right of first refusal with respect to the sublease or assignment of each lease.

**Section 5.04  Conduct of Business.**  Until the Closing, Seller shall conduct its business diligently and in substantially the same manner as it has previously been carried out.

**Section 5.05  Public Announcements.**  Unless otherwise required by applicable Law, no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

**Section 5.06  Receivables.**  From and after the Closing, if Seller or any of its Affiliates receives or collects any funds relating to any services rendered by Anvil Power or any other Purchased Asset, Seller or its Affiliate shall remit such funds to Anvil Power within five (5) business days after its receipt thereof. From and after the Closing, if either Buyer or its Affiliate receives or collects any funds relating to any services rendered by Seller, Buyer or its Affiliate shall remit any such funds to Seller within five (5) business days after its receipt thereof.

**Section 5.07  Transfer Taxes.**  All sales, use, registration, and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Transaction Documents, if any, shall be borne and paid by Seller when due. Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

**Section 5.08  Further Assurances.**  Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

**Section 5.09  Third Party Consents.**  Each party agrees to cooperate with the others in connection with the transition of the Anvil Power Purchased Assets and the Anvil Equipment Purchased Assets from Seller to Buyers and the assumption of the Assigned Contracts, including without limitation obtaining consents, authorizations, orders and approvals in writing from Pacific Gas & Electric that are required to assign the PG&E Contracts to Anvil Power, in each case, in form and substance reasonably satisfactory to Anvil Power and Seller and obtaining any releases of any guaranties associated with the Assigned Contracts.  The parties will cooperate with the notification of third parties of Buyers' acquisition of the Anvil Power Purchased Assets and the Anvil Equipment Purchased Assets or assumption of the Assigned Contracts and will further cooperate with obtaining all applicable third-party consents and approvals, and release of any personal guaranties associated with the Assigned Contracts (provided that no such release shall be a condition to Closing).  To the extent that Seller's rights under any of the Anvil Power Purchased Assets and the Anvil Equipment Purchased Assets may not be assigned to Buyers without the consent of another Person which has not been obtained as of Closing (a "**Restricted Asset**"), this Agreement shall not constitute an agreement to sell, assign, transfer or deliver the Restricted Asset. Following Closing, Seller shall use commercially reasonable efforts, and cooperate with Buyers' requests, to obtain the Consent(s) relating to each Restricted Asset as soon as practicable.  Pending the obtaining of such Consents relating to any Restricted Asset, the parties shall cooperate with each other in any reasonable and lawful arrangements designed to provide to Buyers the benefits of use of such Restricted Asset (or any right or benefit arising thereunder, including the enforcement for the benefit of Buyers of any and all rights of the applicable Seller against a third party thereunder). Once any necessary Consent to the sale, conveyance, assignment, transfer and delivery of a particular Restricted Asset is obtained, the Restricted Asset shall then be deemed to be a Purchased Asset.

## ARTICLE VI
## CONDITIONS TO CLOSING

**Section 6.01  Conditions to Obligations of All Parties.**  The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)     No governmental authority shall have enacted, issued, promulgated, enforced or entered any governmental order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b)     California Bank of Commerce shall have delivered a written payoff demand providing for the release of its security interest in the Anvil Equipment Purchased Assets upon receipt of a cash payment.

(c)     Buyers shall be satisfied, in their sole discretion, with their due diligence investigation of Seller and the assets to be acquired by Buyers pursuant to this Agreement.

(d)     The parties shall have agreed to the valuation of the Anvil Equipment Purchased Assets, which shall not exceed the specific amount set forth in Section 1.03(d).

**Section 6.02 Conditions to Obligations of Buyer.** The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)     Other than the representations and warranties of Seller contained in Section 3.01, Section 3.02, and Section 3.10, the representations and warranties of Seller contained in this Agreement, the Ancillary Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality) or in all material respects (in the case of any representation or warranty not qualified by materiality) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Seller contained in Section 3.01, Section 3.02, and Section 3.10 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)     Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date.

(c)     No Action shall have been commenced against Buyer or Seller, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

(d)     From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

(e)     Seller shall have delivered to Buyer such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

13

**Section 6.03 Conditions to Obligations of Seller.** The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)     Other than the representations and warranties of Buyer contained in Section 4.01 and Section 4.02, the representations and warranties of Buyer contained in this Agreement, the Ancillary Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or material adverse effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Buyer contained in Section 4.01 and Section 4.02 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)     Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date.

(c)     No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(d)     Buyers and Seller agree on the purchase price for the Anvil Equipment Purchased Assets, which shall not exceed the specific amount set forth in Section 1.03(d).

# ARTICLE VII
# INDEMNIFICATION

**Section 7.01 Survival.** All representations, warranties, covenants, and agreements contained herein and all related rights to indemnification shall survive the Closing.

**Section 7.02 Indemnification by Seller.** Subject to the other terms and conditions of this ARTICLE VIII, from and after Closing, Seller shall indemnify and defend each of Buyer and its Affiliates and their respective Representatives (collectively, the "**Buyer Indemnitees**") against, and shall hold each of them harmless from and against, any and all losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees (collectively, "**Losses**"), incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, or with respect to:

(a)     any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement, any other Transaction Document, or any schedule, certificate, or exhibit related thereto, as of the date such representation or warranty was made or as if such

representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)     any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Seller pursuant to this Agreement, any other Transaction Document, or any schedule, certificate, or exhibit related thereto;

(c)     any asset of Seller that is not acquired by Buyers pursuant to this Agreement or any Liability of Seller that is not assumed by Buyers pursuant to this Agreement; or

(d)     any Third-Party Claim based upon, resulting from, or arising out of the business, operations, properties, assets, or obligations of Seller or any of its Affiliates conducted, existing, or arising on or prior to the Closing Date. For purposes of this Agreement, "**Third-Party Claim**" means notice of the assertion or commencement of any Action made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing.

**Section 7.03  Indemnification Basket**.  Seller shall not be liable to the Buyer Indemnitees for indemnification under Section 7.02 until the aggregate amount of all Losses in respect of indemnification under Section 7.02 exceeds $50,000 (the "*Basket*"), in which event Seller shall be required to pay or be liable for all such Losses that exceed the Basket.

**Section 7.04   Indemnification Cap.**  In no event shall the aggregate amount of Losses for which the Buyer Indemnities shall be entitled to indemnification under this ARTICLE VII shall exceed the sum of (i) the Anvil Power Fixed Component, (ii) the Profit Percentage payments, and the Anvil Equipment Purchase Price less debt owed by Seller on the equipment sold to Buyer.

**Section 7.05  Indemnification by Buyer.**  Subject to the other terms and conditions of this ARTICLE VII, from and after Closing, Buyer shall indemnify and defend each of Seller and its Affiliates and their respective Representatives (collectively, the "**Seller Indemnitees**") against, and shall hold each of them harmless from and against any and all Losses incurred or sustained by, or imposed upon, the Seller Indemnitees based upon, arising out of, or with respect to:

(a)     any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement, any other Transaction Document, or any schedule, certificate, or exhibit related thereto, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)     any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Buyer pursuant to this Agreement; or

(c)     any Assumed Liability.

15

**Section 7.06 Indemnification Procedures.** Whenever any claim shall arise for indemnification hereunder, the party entitled to indemnification (the "**Indemnified Party**") shall promptly provide written notice of such claim to the other party (the "**Indemnifying Party**"). In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a Person who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and expense. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any damages resulting therefrom. The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld or delayed).

**Section 7.07 Cumulative Remedies.** The rights and remedies provided in this ARTICLE VII are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

## ARTICLE VIII
## MISCELLANEOUS

**Section 8.01 Expenses.** All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses; *provided, however*, Seller shall pay all amounts payable to Baserock Partners.

**Section 8.02 Notices.** All notices, claims, demands, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient, or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.02):

**If to Seller:**  Mr. Richard Kingsborough
Ms. Cindy Kingsborough
Kingsborough Atlas Tree Surgery, Inc.
1544 Ludwig Avenue
Santa Rosa, CA 95407

16

Email: rich@atlas-tree.com

**If to Buyer:**        Mr. Alan C. Guy
Anvil Builders Inc
1550 Park Avenue
Emeryville, CA 94608
Email: alan@anvilbuilders.com

      **Section 8.03  Interpretation; Headings.**  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

      **Section 8.04  Severability.**  If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement.

      **Section 8.05  Entire Agreement.**  This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents.

      **Section 8.06  Successors and Assigns.**  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. Any purported assignment in violation of this Section shall be null and void. No assignment shall relieve the assigning party of any of its obligations hereunder.

      **Section 8.07  Amendment and Modification; Waiver.**  This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise, or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy.

      **Section 8.08  Governing Law.**  All matters arising out of or relating to this Agreement shall be governed by and construed in accordance with the internal laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction).

DocuSign Envelope ID: 96DDC66D-5F1E-4EC9-895C-977A1AA40A6A

**Section 8.09  Arbitration.**   Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Alameda County, California before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. Judgment on the Award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

**Section 8.10  Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Signatures on following page]*

Case: 25-01008   Doc# 1   Filed: 05/21/25   Entered: 05/21/25 12:04:34   Page 72 of 85

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above.

KINGSBOROUGH ATLAS TREE SURGERY, INC.
a California corporation

By _____
Richard Kingsborough
Chief Executive Officer

_____
RICHARD KINGSBOROUGH, individually

_____
CINDY KINGSBOROUGH, individually

ANVIL BUILDERS INC
a California corporation

By _____
Alan C. Guy
Chief Executive Officer

19

DocuSign Envelope ID: 96DDC66D-5F1E-4EC9-895C-977A1AA40A6A

**EXHIBIT A**

Ex A

DocuSign Envelope ID: 96DDC66D-5F1E-4EC9-895C-977A1AA40A6A

# EXHIBIT 1.05
# PURCHASE PRICE ALLOCATION

Ex 1.05

# EXHIBIT 1.06

# EXISTING CONTRACTS

**Current Atlas Contracts for Forest management
and Heavy Com 6/6/23**

| Contract Name | Client |
|---|---|
| El Dorado Resource-SAT Phase II | El Dorado Resource Conservation District |
| WUI Vegetation Management - City of Chula Vista | City of Chula Vista |
| 04A6314- District 4 Maintenance | California Department of Transportation |
| STD213 - Caltrans_ Vegetation Management, Tree Removal Services, and Brush Mastication services in Siskiyou County (IFB 02A2068) | California Department of Transportation |
| NFF - Liberty Utilities Resilience Corridor – Phase 1_625 Line Project | National Forest Foundation |
| County of El Dorado - Caldor Fire Right-of-Way Tree Removal Services | County of El Dorado |
| MCRCD-Northern Red Mtn Forest Health Improvement | Mendocino Resource Conservation District |
| 04A6441- District 4 Maintenance- Foster City | California Department of Transportation |
| 04A6568- District 4 Stump Grinding | California Department of Transportation |

Ex 3.03

# EXHIBIT B

DocuSign Envelope ID: 96DDC66D-5F1E-4EC9-895C-977A1AA40A6A

# LINE OF CREDIT AND SECURITY AGREEMENT

This Agreement is made and entered into as of June 5, 2023 between KINGSBOROUGH ATLAS TREE SURGERY, INC., a California corporation ("**Borrower**") and ANVIL BUILDERS INC., a California corporation ("**Lender**").

1.      The Loan.

      1.1      Advances.  Subject to the limitations set forth below, from time to time and upon the request of Borrower, Lender has advanced to Borrower a total of $1,180,000 on the terms and conditions hereinafter set forth, and may in its sole discretion lend in the future additional sums requested by Borrower on such terms and conditions (individually, an "**Advance**", and collectively, the "**Advances**").  The total aggregate amount of all outstanding Advances plus all accrued but unpaid interest thereon may be referred to as the "**Loan**."

      1.2      Use of Proceeds.  The Advances shall be used solely to pay Borrower's payroll and equipment financing expenses and other expenses approved by Lender.

      1.3      Promissory Note.  The obligation of Borrower to repay the Loan shall be evidenced by a Subordinated Secured Promissory Note (the "**Note**") dated the date of this Agreement.

      1.4      Term of Commitment.  Lender's commitment to lend under this Agreement shall terminate on June 30, 2023.

      1.5      No Advances if Default.  As a condition precedent to Lender's obligation to make any Advance, on and as of the date of such Advance, there shall not exist an Event of Default or an event which, with the giving of notice or passage of time, or both, would be an Event of Default.

2.      Security Interest.

      2.1      Grant of Security Interest.

      (a)      Borrower hereby grants to Lender a junior security interest in all present and future tangible and intangible property of Borrower, including, but not limited to, (1) goods, inventory, work in process, finished goods, equipment, furniture and proceeds therefrom, (2) money, documents, instruments, accounts, chattel paper, and (3) licenses, franchises, permits, patents, patent rights, copyrights, works which are the subject matter of copyrights, trademarks, trade names, trade styles, patent and trademark applications and licenses and rights thereunder, and all other rights under any of the foregoing, all extensions, renewals, reissues, divisions, continuations, and continuations-in-part of any of the foregoing, and all rights to sue for past, present, and future infringement of the foregoing; inventions, trade secrets, formulae, processes, compounds, drawings, designs, blueprints, surveys, reports, manuals, software, including source code and operating standards; goodwill; general intangibles including, but not limited to, state, federal and local government tax refunds, mailing lists, customer lists, supplier lists and other lists and data in whatever form maintained, trade secret rights, rights in works of authorship, and contract rights relating to computer software programs, in whatever form maintained, Borrower's rights under contracts with employees and third parties and proceeds therefrom; and Borrower's interest in other entities.  The property described above may be referred to as the "**Collateral**."

DocuSign Envelope ID: 96DDC66D-5F1E-4EC9-895C-977A1AA40A6A

(b)     The security interest granted in paragraph 2.1(a) above shall secure the payment of the indebtedness evidenced by the Note, and the payment and performance of all other liabilities, debts and obligations of Borrower to Lender, absolute or contingent, due or to become due, now existing or hereafter arising including liabilities, debts and obligations arising pursuant to this Agreement and because of funds advanced in the future by Lender, all herein called "**Obligations**."

2.2     Priority.  The security interest granted in the Collateral pursuant to this Agreement is junior to existing security interests previously granted by Borrower in connection with Borrower's existing secured debt.

2.3     Taxes.  Borrower will pay all taxes and assessments of any nature that may be levied or assessed against the Collateral.

2.4     Use of Collateral.  Borrower will not use the Collateral in violation of any applicable statutes, regulations or ordinances.

2.5     Preservation of Collateral.  At its option Lender may discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the Collateral, may place and pay for insurance thereon, may order and pay for the repair, maintenance and preservation thereof and may pay any necessary filing or recording fees.  Borrower shall reimburse Lender on demand for any payment made or any expense incurred by Lender pursuant to the foregoing authorization.  Until default, Borrower may have possession of the Collateral and use it in a lawful manner, and upon default Lender shall have the immediate right to the possession of the Collateral.

2.6     Financing Statement Filings.  Borrower agrees that one or more financing statements pertaining to the Collateral shall be filed with the office of the Secretary of State of the State of California.  Borrower will immediately notify Secured Party of any condition or event that may change the proper location for the filing of any financing statement or other public notice or recording for the purpose of perfecting security interest in the Collateral.

3.     Representations and Warranties of Borrower.  To induce Lender to enter into this Agreement, Borrower makes the following representations and warranties to Lender:

3.1     Corporate Status.  Borrower is duly incorporated, validly existing and in good standing under the laws of the State of California.  Borrower does not own or lease any material property or conduct any material business in any other state.  Borrower has corporate power and authority to own its properties and assets and to carry on its business as it is currently being conducted.  Borrower has corporate power and authority to enter into and perform this Agreement, and the Note, and to borrow hereunder.

3.2     No Breach or Violation.  This Agreement and the Note will not violate any provision of law or of any articles of incorporation or bylaws, or result in a breach of, or constitute a default or require any consent under, or result in the creation of any lien, charge, or encumbrance upon the property or assets of Borrower, any indenture or other agreement or instrument to which Borrower is a party or to which Borrower or its properties may be bound or affected, other than agreements with California Bank of Commerce and as specifically provided herein.

2

3.3 <u>Enforceability</u>. This Agreement and the Note have been duly authorized, executed and delivered and constitute legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, subject to the effect of bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect generally affecting creditors' rights. Except as previously disclosed in writing to Lender, this Agreement, along with all action required to fully perfect Lender's security interests hereunder, which action has been taken or completed, create and constitute, to the extent permitted by law, valid and perfected security interests in and to the collateral herein described enforceable against all third parties and secure the payment of the Borrower's obligations under this Agreement and the Note and any other obligations (monetary or otherwise) of Borrower to Lender.

3.4 <u>Litigation</u>. There are no actions, suits or proceedings pending or, to the knowledge of Borrower, threatened against or affecting Borrower, or any of its assets, properties or rights, at law or in equity, by or before any court, arbitrator, administrative or governmental body or other person which, if determined adversely, would have a material adverse effect on the business, properties, condition (financial or otherwise) or operations of Borrower.

3.5 <u>Compliance With Laws and Contracts</u>. Borrower is not in violation or default with respect to any applicable law or regulation which affects the business, properties, condition (financial or otherwise) or operations of Borrower, nor is it in violation or in default with respect to any order, writ, injunction, demand or decree of any court, or any indenture, agreement or other instrument under which it is bound or may be bound, default under or violation of which might have an adverse effect on the business, properties, condition (financial or otherwise) or operations of Borrower or might result in the acceleration of the maturity of any of its indebtedness.

3.6 <u>No Subsidiaries</u>. Borrower has no subsidiaries or any other entity that directly, or indirectly through one or more intermediaries, is controlled by Borrower.

3.7 <u>Taxes</u>. Borrower has filed or caused to be filed all tax returns that are required to be filed, and has paid all taxes shown to be due and payable on such returns or on any assessments made against it, except for returns which have been appropriately extended, and all other taxes, fees or other charges imposed on it by any governmental authority, agency or instrumentality that have become due and payable (other than those the amount or validity of which is currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with generally accepted accounting principles have been provided on the books of Borrower) and no tax liens have been filed.

3.8 <u>Authorized Officers</u>. The officers of Borrower executing this Agreement and the Note are duly and properly in office and fully authorized to execute such agreements or instruments.

3.9 <u>No Event of Default</u>. No event has occurred and is continuing which constitutes an Event of Default as defined in Section 4.1, or which, upon a lapse of time or notice or both, would become such an Event of Default.

4. <u>Default and Remedies</u>.

4.1 <u>Default</u>. Borrower shall be in default under this Agreement upon the happening of any of the following events or conditions (an "**Event of Default**"):

(a) The failure to pay or perform any obligation under this Agreement following not less than seven (7) days' advanced notice to Borrower or the Note;

(b) Any representation or warranty made by Borrower in this Agreement or any writing furnished in connection with or pursuant to this Agreement shall be false in any material respect or shall omit any material fact on the date as of which made; or

(c) The dissolution or liquidation of Borrower, the appointment of a receiver for any part of the property of Borrower, the assignment for the benefit of creditors, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

4.2 <u>Remedies</u>. Upon an Event of Default, Lender may declare all obligations of Borrower under this Agreement and the Note immediately due and payable, and may exercise in respect of the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to Lender, all the rights and remedies of a secured party under the California Uniform Commercial Code.

5. <u>Miscellaneous</u>.

5.1 <u>Attorneys' Fees and Expenses</u>. If either party to this Agreement commences any action or proceeding against the other party by reason of any breach or alleged breach of any term or condition of this Agreement or the Note, or for the interpretation of this Agreement or the Note, or with respect to any other claim arising in any manner whatsoever out of this Agreement or the Note, the prevailing party in such an action or proceeding shall be entitled to recover its reasonable attorneys' fees (including attorneys' fees on appeal, and costs and expenses incurred in out-of-court negotiations, workouts, and/or settlements or in seeking relief from stay or otherwise seeking to protect its rights in any bankruptcy proceeding) and all reasonable costs (including costs of consultants and experts) incurred. The court shall determine the prevailing party. The term "**expenses**" as used herein means any expenses incurred in connection with any of the out of court or state, federal or bankruptcy proceedings referenced above, including but not limited to the fees and expenses of any appraisers, consultants and expert witnesses retained or consulted by such party. In addition the prevailing party shall be entitled to its attorneys' fees, costs and expenses incurred in any post-judgment proceedings to collect and enforce the judgment. This provision is separate and several and shall survive the merger of this Agreement or the Note into any judgment on this Agreement or the Note.

5.2 <u>Governing Law and Jurisdiction</u>. This Agreement shall be governed by and construed under the laws of the State of California. The state courts of the State of California shall have exclusive jurisdiction to adjudicate any dispute arising out of this Agreement. Each of the parties hereby expressly consents to (1) the personal jurisdiction of the courts of California and (2) service of process being effected upon it by registered mail sent to the address set forth at the end of this Agreement.

4

5.3 <u>Entire Agreement; Amendment</u>. This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions between them. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement shall be effective unless in writing signed by the party to be charged.

5.4 <u>Waiver</u>. No failure or delay on the part of Lender in exercising any right, power or privilege under this Agreement or the Note and no course of dealing between Borrower or any other person and Lender shall operate as a waiver hereof or thereof; nor shall any single or partial exercise of any right, power or privilege preclude any other further exercise of any other right, power or privilege. No notice to or demand on Borrower in any case shall entitle Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of Lender to any other or further action in any circumstances without notice or demand.

5.5 <u>Descriptive Headings</u>. The descriptive headings of this Agreement are inserted for convenience only and shall not be deemed to affect the meaning or construction of any of the provisions hereof.

5.6 <u>Successors and Assigns</u>. This Agreement shall be binding upon each of the parties hereto, its successors and assigns. Borrower may not transfer or assign any or all of its rights or obligations hereunder without the prior written consent of Lender.

5.7 <u>Notices</u>. Any notice required or permitted by this Agreement shall be deemed given if sent by registered mail, postage prepaid, addressed to the other party at the address shown below such party's name on the last page of this Agreement or at such other address for which such party gives notice hereunder. Delivery shall be deemed effective three days after deposit with the postal authorities.

5.8 <u>Severability</u>. If any provision of this Agreement is held to be invalid by a court of competent jurisdiction, then the remaining provisions shall nevertheless remain in full force and effect. The parties agree to renegotiate in good faith any term held invalid and to be mutually bound by the substitute provision.

[Signature Page Follows]

DocuSign Envelope ID: 96DDC66D-5F1E-4EC9-895C-977A1AA40A6A

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

KINGSBOROUGH ATLAST TREE SURGERY, INC., a California corporation

By: *Richard Kingsborough*

Richard Kingsborough, Chief Executive Officer

Address:
1544 Ludwig Avenue
Santa Rosa, CA 95407

"Borrower"

ANVIL BUILDERS INC.,
a California corporation

By: *Alan C. Guy*

Alan C. Guy, Chief Executive Officer

Address:
1550 Park Avenue
Emeryville, CA 94608

"Lender"

6

# PROOF OF SERVICE

I am a citizen of the United States. My business address is 100 B Street, Suite 400, Santa Rosa, CA 95401. I am employed in the County of Sonoma where this service occurs. I am over the age of 18 years and not a party to the within cause.

On the date set forth below, following ordinary business practice, I served a ***true copy*** of the following document(s):

On the date set forth below, following ordinary business practice, I served a ***true copy*** of the following document(s):

**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF:**

1. **BREACH OF CONTRACT;**
2. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**
3. **UNFAIR COMPETITION (BUS. & PROFFESSIONS CODE SECTION 17200);**
4. **CONVERSION;**
5. **FRAUD (INTENTIONAL MISREPRESENTATION);**
6. **NEGLIGENT MISREPRESENTATION;**
7. **CONSPIRACY TO DEFRAUD;**
8. **ACCOUNTING;**
9. **DECLARATORY RELIEF; AND**
10. **INJUNCTIVE RELIEF**

addressed as follows :

| | |
|---|---|
| Sean J. Filippini<br>DOWNEY BRAND LLP<br>621 Capitol Mall, 18th Floor<br>Sacramento, CA 95814<br>Telephone: (916) 444.1000<br>Facsimile: (916) 444.2100<br>Email:<br>sfilippini@downeybrand.com | Attorneys for Defendants<br><br>ANVIL POWER, INC., ANVIL EQUIPMENT COMPANY LP, ANVIL BUILDERS, ANVIL HOLDINGS, INC., ANVIL GROUP, LLC, and ALAN GUY |

☒ (BY EMAIL) (C.C.P. §§ 1010.6(a)(2) and (e)(1 and 2)) – I caused the aforementioned document(s) to be electronically served upon the addressee(s) as indicated above. The email address(es) to be used for electronic service has/have been confirmed and acceptance of electronic service has been agreed, pursuant to the requirements for electronic service. Please contact our office immediately should any recipient object to continued electronic service.

☒ (BY ELECTRONIC SERVICE VIA ONE LEGAL) I transmitted a true and correct copy of the document(s) listed above to One Legal to be sent to all parties listed on the Proof of Service. This service complies with local rules and California Rules of Court Rule 2.251. A copy of the One Legal Filing Receipt page will be maintained with the original document(s) in our office.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED: May 13, 2025

*Dawn Marshall*
_____
Dawn Marshall

CARLE, MACKIE,
POWER & ROSS, LLP

PROOF OF SERVICE

# CERTIFICATE OF SERVICE

I am a citizen of the United States. My business address is 100 B Street, Suite 400, Santa Rosa, CA 95401. I am employed in the County of Sonoma where this service occurs. I am over the age of 18 years and not a party to the within cause.

On the date set forth below, following ordinary business practice, I served a *true copy* of the following document(s):

**NOTICE OF REMOVAL OF LAWSUIT PENDING IN STATE COURT TO BANKRUPTCY COURT [28 USC § 1452**

addressed as follows :

| Sean J. Filippini<br>DOWNEY BRAND LLP<br>621 Capitol Mall, 18th Floor<br>Sacramento, CA 95814<br>Telephone: (916) 444.1000<br>Facsimile: (916) 444.2100<br>Email:<br>sfilippini@downeybrand.com<br>srussell@DowneyBrand.com | Attorneys for Defendants<br><br>ANVIL POWER, INC., ANVIL EQUIPMENT COMPANY LP, ANVIL BUILDERS, ANVIL HOLDINGS, INC., ANVIL GROUP, LLC, ALAN GUY and RICHARD J. LEIDER |
|---|---|

☒ (BY ELECTRONIC SERVICE VIA THE COURT'S ELECTRONIC CASE FILING ("ECF") SYSTEM) I transmitted a true and correct copy of the document(s) listed above to ECF to be sent to all parties listed on the Proof of Service. This service complies with Fed. R. Civ. P. 5(d)(3). A copy of the Filing Receipt page will be maintained with the original document(s) in our office.

Clerk of the Court
Sonoma Superior Court
3055 Cleveland Avenue
Santa Rosa, CA 95403

☒ (BY FIRST CLASS MAIL) I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States mail at Santa Rosa, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: May 21, 2025

/s/ Dawn Marshall
Dawn Marshall